ROBERT F. MAXWELL & another *vs.* EDWARD F. RATCLIFFE
& others.

Middlesex.  December 3, 1969. — December 31, 1969.

Present: SPALDING, CUTTER, KIRK, SPIEGEL, & QUIRICO, JJ.

*Deceit. Sale,* Sale of real estate. *Broker,* Deceit.

A cause of action for deceit by the buyers against brokers of the seller in
a sale of a dwelling was proved by evidence that, in response to in-
quiries by the buyers before the sale, the brokers stated as a fact that
the cellar was dry, whereas it actually was subject to "water seepage
periodically," as the brokers knew or should have ascertained, that
the buyers relied on such representations in consummating the sale,
and that the buyers suffered damage because of the condition of the
cellar.

TORT OR CONTRACT.  Writ in the Fourth District Court
of Eastern Middlesex dated September 26, 1966.

Following removal of the action to the Superior Court,
transfer to the District Court under G. L. c. 231, § 102C,
and retransfer to the Superior Court, the action was tried
before *Sullivan,* J.

*Daniel J. Johnedis* for the plaintiffs.

CUTTER, J.  In this action of tort or contract Maxwell
and his wife seek to recover damages alleged to have been
sustained by misrepresentations concerning a house sold by
Ratcliffe to the Maxwells.[1]  The case is before us on a bill
of exceptions on which the Maxwells now present only the
question whether the trial judge correctly directed a verdict
for each of Ratcliffe's two brokers, Jose Henriques and
Marshall T. Slater, on the counts in tort against them,
respectively.  The jury could have found the facts stated
below.

---

[1] Counts in warranty against all three defendants and the count against
Ratcliffe in tort have been waived.

The Maxwells on October 4, 1964, stopped at Henriques's real estate office. They found there Slater and his wife. Mrs. Maxwell told Slater she wanted to buy a small ranch house with specifications mentioned by her. Slater drove the Maxwells to 20 Davis Street, Woburn, and showed the Maxwells the house, including the cellar. Mrs. Maxwell "told Slater the cellar looked large enough to build a room there" to use as a playroom for her grandchildren. She "saw a hole in the cellar and something sticking out of it." She "asked Slater what it was, and he said he did not know." Her husband "said it looked like a pump." She said, "[W]hat's a pump doing here?" Slater "said he didn't know but . . . it didn't look as if it had been used." The cellar was then dry and there was no water in the hole. Mrs. Maxwell asked, "[I]s the cellar dry?" Slater replied that the Ratcliffes "had a 9 x 12 rug on the other side of the cellar and it was dry." She also "asked Slater why there wasn't any bulkhead there, and he said that he didn't know and that it's dry." She believed and relied upon Slater's representation, and Henriques's representations mentioned below, that the cellar was dry "in making her decision to buy the house, and would not have bought the house had she known that the representation was not true because she wanted to build a room in the basement."

Mrs. Maxwell went to the house again on October 7 with her daughter and a friend, William A. Curry, "who was going to try to build the playroom." They met Henriques at his office and were driven by him to the house. While in the basement "they asked Henriques why the pump was there, and he said he didn't know, that they may have had water at some time." Curry also "talked with Henriques about building the room and asked if the cellar was dry, and Henriques said the cellar was dry."[2] Mrs. Maxwell then said that Slater "had told her there was a rug on the floor and she took it for granted that it was dry."

---

[2] Curry testified that Henriques, when asked if the pump was used, said, "to my knowledge, no; that . . . he thought at one time they had a big storm or flood of some sort and put it in in case it happened again."

The Maxwells bought the house and moved in on November 7. About five to six weeks later water came into the cellar "except during dry spells" and the pump "did not take care of the water." The playroom was never built because the cellar "was wet . . . and the floor had water on it." Some property was damaged by water.

Ratcliffe told a broker, one DiPanfilo, about the water problem when he went to him about selling the house. There was later a multiple listing of the house and the executive secretary of a real estate board sent information about this house to each member of the board's multiple listing service, including Henriques's office. The "listing stated in part that the list price was $16,500 and contained the following remarks: 'Sump pump in cellar, gets some water seepage periodically.'" It was agreed that Slater and Henriques were engaged as brokers for Ratcliffe in the sale of the house.

The evidence summarized above came from several witnesses called by the Maxwells. Verdicts were directed for Slater and Henriques at the close of the plaintiffs' case.

The evidence permitted the jury to conclude that both Slater and Henriques represented that the cellar was dry. They could infer that Slater and Henriques were associated in the same office and that each had, or should have had, knowledge of the facts about "water seepage periodically" stated in the multiple listing. The state of the cellar was, in any event, an existing fact susceptible of knowledge. *Yorke* v. *Taylor*, 332 Mass. 368, 371. *Pietrazak* v. *McDermott*, 341 Mass. 107, 109. *Powell* v. *Rasmussen*, 355 Mass. 117, 119. The brokers' statements, according to the testimony, were not mere expressions of opinion or statements promissory in character. They could reasonably be viewed as flat statements that the cellar was dry. Cf. *Yerid* v. *Mason*, 341 Mass. 527, 529–531; *Fogarty* v. *Van Loan*, 344 Mass. 530, 531–532; *Richman* v. *Seaberg*, 353 Mass. 757, 758. Because the question of the dryness of the cellar had been raised expressly, there was special obligation on the brokers to avoid half truths and to make disclosure at

least of any facts known to them or with respect to which they had been put on notice. See *Kannavos* v. *Annino, ante,* 42, 46–50.

There was ample evidence of reasonable reliance and damage. The brokers acted in respects in which they owed a duty, not only to their principal, Ratcliffe, but to the Maxwells with whom they dealt directly. See *Coe* v. *Ware,* 271 Mass. 570, 572–574.

The jury could conclude that all the elements of a cause of action in deceit had been proved. It was error to direct verdicts for the brokers.

*Exceptions sustained.*