396 Mass. 760 (1986)
489 N.E.2d 185
DATACOMM INTERFACE, INC.
vs.
COMPUTERWORLD, INC. & another;[1] SHELDON G. ADELSON, third-party defendant.
Supreme Judicial Court of Massachusetts, Middlesex.
October 10, 1985.
February 18, 1986.
Present: HENNESSEY, C.J., WILKINS, LIACOS, LYNCH, & O'CONNOR, JJ.
David Wolf (Edward R. Schwartz with him) for the plaintiff.
Andrew F. Lane (Steven J. Goldberg with him) for the defendants.
LYNCH, J.
In December, 1975, the plaintiff, Datacomm Interface, Inc. (DCI), commenced this nonjury unfair competition action against DataComm User, Inc. (User), and its parent company Computerworld, Inc. All these parties are Massachusetts corporations. Shortly thereafter, DCI obtained a temporary restraining order against User and Computerworld, enjoining the defendants from using the name "DATACOMM '76" to promote its 1976 national data communications trade show. The judge referred the case to a master and on his recommendation dissolved the temporary restraining order and also denied DCI's motion for a preliminary injunction. User then counterclaimed against DCI, ultimately alleging that DCI engaged in unfair competition, conversion, abuse of process, interference with contractual relations, and defamation. User later amended its counterclaim, adding Sheldon G. Adelson, a principal of DCI, as a party. In February, 1976, User was granted a preliminary injunction enjoining DCI and Adelson from using a copy of a magazine circulation list.
*763 Hearings before the master began in 1977, after the master allowed the defendants' motion for a bifurcated trial. In July, 1980, after approximately fifty days of trial, the master issued his final report on liability (facts final), finding against DCI on its unfair competition claim, and finding for User on its counterclaim for unfair competition, conversion, and abuse of process. User and Computerworld filed a motion pursuant to G.L.c. 231, § 6F (1984 ed.), for reasonable costs and attorney's fees, a motion to confirm the master's report, and later amended the counterclaim to include a claim under G.L.c. 93A, § 11.
In November, 1980, a judge confirmed the master's report on liability,[2] and ordered the case recommitted to the master for findings on the issue of counterclaim damages.
The master submitted his report (facts final) on User's counterclaim damages in December, 1982, awarding total damages of $33,250. The judge recommitted the case to the master for findings relating to the motion under G.L.c. 231, § 6F, and for clarification of a portion of the damage award. In August, 1984, after the master filed his report after recommittal, the judge confirmed the master's report on damages, denied User and Computerworld's motion under G.L.c. 231, § 6F, and ruled that DCI and Adelson's actions had not constituted a violation of G.L.c. 93A. Judgment was entered in favor of User and Computerworld in the original action and for User on the counterclaim for $33,250.
All parties filed notices of appeal. DCI filed a motion including a request for leave to file a statement of the evidence. The judge denied the motion in October, 1984. DCI and Adelson nevertheless filed a statement of the evidence, and the judge allowed User and Computerworld's motion to strike the statement, imposing sanctions of $300. We granted DCI and Adelson's application for direct appellate review.
On appeal, DCI argues that the circumstances of User and Computerworld's promotion and operation of their data communications trade show, "DATACOMM '76," did in fact constitute *764 unfair competition and that the master's report was erroneously confirmed; the master's failure to submit summaries and to report certain excluded evidence constituted prejudicial error; it was error to strike DCI and Adelson's statement of the evidence and to impose sanctions; and the damage awards are unsupported by the master's findings. On cross appeal, User challenges the denial of relief under G.L.c. 231, § 6F, and G.L.c. 93A. We affirm the judgment as it applies to DCI's unfair competition action. We affirm the judgment on User's counterclaim in part and reverse in part.
Sheldon G. Adelson was the principal investor in Communications Trends, Inc. (Trends), which in June, 1972, began publishing a magazine called The Data Communications User (TDCU) and continued publishing it continuously until May, 1975. The first issue of TDCU announced that it would sponsor a national trade show devoted exclusively to data communications called Data Communications INTERFACE '73. In July, 1972, Trends formed DCI, the plaintiff in this action, a wholly owned corporation. DCI was intended to own and operate the INTERFACE shows. The master found, however, that DCI never operated as a separate financial entity.
Trends and DCI had jointly obtained a loan from Capitol Bank, having pledged all the assets of both corporations as collateral. Trends suffered financial difficulty in May, 1975. Although Trends filed a petition in bankruptcy, Capitol Bank, pursuant to its security agreement with Trends and DCI, successfully foreclosed on the loan. In June, 1975, Computerworld purchased all assets of Trends which had been used in the publication and marketing of TDCU. The sale to Computerworld included: all copies of circulation lists used by Trends for subscription, circulation, or other such purposes in any form; all promotional materials; all rights to the name "The Data Communications User," and all other names owned by Trends; and all trademarks and goodwill pertaining to the publications.
Just after purchasing TDCU, Computerworld formed DataComm User, Inc., a wholly owned subsidiary corporation. The new publishers of TDCU decided that the magazine would *765 again sponsor a data communications trade show, now to be called DATACOMM '76, to be held in New Orleans at the same site as INTERFACE '75.
The master found that the public was not confused or misled as to the source or origin of the DATACOMM '76 or INTERFACE '76 show. The master did find that some confusion existed as to which show was indeed the "ongoing" show. Although DCI's show was officially named Data Communications INTERFACE, it was, from its inception, commonly and popularly called INTERFACE. INTERFACE was the name by which DCI's show was intended to be known.
The master found that an allegation in the complaint in the instant action verified by Adelson that "the name Data Communications '7- has acquired a meaning exclusively identified with the product and services of the plaintiff so as to indicate the plaintiff's show" was a knowing misstatement. The master also found that Adelson knew INTERFACE '73, '74, and '75 had never been known as Data Communications '7-.
1. Procedural issues.
a. Summary of the evidence. DCI contends that by failing to append summaries of the evidence to his report, as requested by DCI, the master violated his duty under Rule 49 (7) of the Superior Court, as amended (1976).[3] We disagree.
The proper practice under rule 49 (7) and Mass. R. Civ. P. 53 (e) (2), 365 Mass. 820 (1974), to raise the issue before the Superior Court judge, whether a finding of the master is supported by evidence, has been extensively treated elsewhere and a detailed review need not be attempted here. See Chase v. Pevear, 383 Mass. 350, 358 (1981), and cases and authorities cited. See also Greaney, Trials Before Masters: A Procedural and Substantive Primer for the Practicing Lawyer, 63 Mass. L. Rev. 195 (1978). DCI failed properly to follow the required procedure. Its procedural missteps are fatal to its claim for summaries.
*766 Shortly after the July, 1980, filing of the master's final report on liability, DCI filed a document entitled, "Plaintiff's Objection to Master's Report re Liability," and moved to recommit the report. This document of approximately seventy-eight pages is an admixture of argument, objections to legal conclusions of the master, objections to factual conclusions of the master, objections to the master's conclusions regarding credibility of witnesses, objections to the master's failure to find facts that the testimony of the plaintiff's witnesses would support, and included numerous exhibits reproduced in part or entirely. This document was discursive, prolix, confusing, and, in part, argumentative. It also contained a request for summaries of the evidence. Most of the objections contain reference to transcript pages or to specific exhibits, but the presentation of the objections is confusing. In November, 1980, the judge allowed the defendants' motion to confirm the liability report without summaries. The plaintiff did not file a motion to order the master to submit summaries prior to the hearing. The master submitted his final report on damages in December, 1982, and in March, 1983,[4] DCI and Adelson filed objections to the report and moved to strike portions of the report or recommit. Requests for summaries of the evidence were dispersed throughout DCI and Adelson's twenty-eight pages of objections. Many of the transcript references are broad and cite fifty and one hundred page sections of transcript at a time. The final report on damages after recommittal was filed without summaries, the master's findings were confirmed, and judgment entered in accordance with the report in August, 1984. DCI and Adelson first moved to have the judge order the master to submit summaries of the evidence in September, 1984. A single justice of the Appeals Court denied a motion under Mass. R.A.P. 15 (c), 365 Mass. 859 (1974), to order the master to report summaries because the case had gone to judgment.
*767 DCI's summary requests fell short of the precision necessary for proper procedure. Even if the requests for summaries were not so lacking in the necessary degree of specificity required under rule 49 (7), as to relieve the master of his obligation regarding summaries, we hold that DCI's failure to file a motion for an order for such summaries until after entry of judgment and four years after its initial submission of a summary request, forecloses any claim of prejudicial error. Even that motion did not comply with the requirement that it be "accompanied by an affidavit of [the objecting party's] counsel setting forth a summary of the evidence as [the objecting party] thinks the master ought to have prepared it, relating each portion of summary to the finding it purportedly contradicts." Thomas O'Connor & Co. v. Medford, 16 Mass. App. Ct. 10, 15 (1983), quoting Miller v. Winshall, 9 Mass. App. Ct. 312, 316 (1980). See Artco, Inc. v. DiFruscia, 5 Mass. App. Ct. 513, 516 n. 3 (1977); J.W. Smith & H.B. Zobel, Rules Practice § 53.10 (1977 & Supp. 1985). In view of the foregoing, the Superior Court judge committed no error in denying DCI and Adelson's 1984 motion to order the master to submit summaries.
b. Statement of the evidence; imposition of sanctions. DCI and Adelson maintain that it was error to strike their statement of the evidence submitted after the denial of their October, 1984, motion to order the master to submit summaries, as they properly complied with Mass. R.A.P. 8 (c), as appearing in 378 Mass. 924 (1979). There was no error. Rule 8 (c) "does not apply to matters referred to masters." Roderick v. Carvalho, 12 Mass. App. Ct. 873, 874 (1981). The subsequent filing of the statement of the evidence was in direct contravention of the judge's ruling of October, 1984. The judge ruled that DCI and Adelson's filing of the statement was frivolous. We do not disagree with his imposition of $300 in sanctions.
c. Excluded evidence. DCI claims that the master, over its objections, wrongfully excluded testimony of six witnesses as inadmissible hearsay.
DCI's "Testimony Exclusion Report Request" states that the excluded evidence concerned "testimony of [six] witnesses that customers and potential customers of Plaintiff made statements *768 to the witnesses indicating that the customers were confused as to whether Plaintiffs or Defendants had the right to represent themselves as [the ongoing data communications trade show]." There was no error. See Programmed Tax Syss. v. Raytheon Co., 439 F. Supp. 1128, 1131 n. 1 (S.D.N.Y. 1977). Moreover, we hold, infra, that acts which led to confusion as to which show was the ongoing show do not support the plaintiff's unfair competition claim. Even if the evidence was not barred by the hearsay rule, therefore, it was not relevant.
2. Unfair competition claim. The master found that there was no confusion as to source or origin of the INTERFACE '76 and DATACOMM '76 shows and that neither defendant engaged in any conduct which would lead the public to believe that the DATACOMM shows were owned or sponsored by DCI. Furthermore, he found that the names DATACOMM and INTERFACE did not confuse or mislead the public as to source or origin of either show. DCI does not seriously contest these findings, but instead challenges the master's legal conclusion that DCI's unfair competition claim was not actionable because likelihood of confusion as to source or origin is an essential ingredient of the tort of unfair competition. DCI argues that the master's findings that confusion existed as to whether INTERFACE '76 or DATACOMM '76 was the ongoing or continuing data communications trade show and that User sought to convince exhibitors and prospective exhibitors that DATACOMM '76 was the ongoing show,[5] are legally sufficient to sustain DCI's unfair competition claim.
In Massachusetts, a plaintiff[6] may recover by showing "either `palming off' or that the features of the product ... [or service] *769 have acquired" a secondary meaning such that confusion as to its source is likely to arise if the defendant is allowed to copy them. Pic Design Corp. v. Bearings Specialty Co., 436 F.2d 804, 807 (1st Cir.1971) (emphasis in original). Professional Economics, Inc. v. Professional Economic Servs., Inc., 12 Mass. App. Ct. 70, 79 (1981). See Paramount Beverage Co. v. Davis Square Liquors, Inc., 354 Mass. 272, 274 (1968), and cases cited. See also Mann v. Parkway Motor Sales, Inc., 324 Mass. 151, 156 (1949). "Palming off" or "passing off" is an attempt to deceive the public into believing it is trading with one person when in fact it is dealing with another. See Summerfield Co. v. Prime Furniture Co., 242 Mass. 149, 155 (1922); Professional Economics, Inc. v. Professional Economic Servs., Inc., supra, quoting Remco Indus. v. Toyomenka, Inc., 286 F. Supp. 948, 954 (S.D.N.Y.), aff'd, 397 F.2d 977 (2d Cir.1968) (the attempt to induce customers to believe that his products are actually those of another). Under either theory, it is evident that the gravamen of an unfair competition claim is the likelihood of consumer confusion as to the source of the goods or services. See Coca-Cola Co. v. Snow Crest Beverages, Inc., 162 F.2d 280, 283 (1st Cir.), cert. denied, 332 U.S. 809 (1947). See also 2 J.T. McCarthy, Trademarks and Unfair Competition § 23:1(A) and (C) (2d ed. 1984). DCI argues that, although the confusion in the context of an unfair competition claim has traditionally meant confusion as to source or origin of goods or services, the trend in Federal and other courts is to include confusion as to sponsorship, endorsement, or some other affiliation. See Stop The Olympic Prison v. United States Olympic Comm., 489 F. Supp. 1112, 1121-1122 (S.D.N.Y. 1980); 2 J.T. McCarthy, Trademarks and Unfair Competition, supra at § 23:1(D) (confusion remedied by unfair competition law is confusion not only as to source, but also as to affiliation, connection, or sponsorship). See also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 204-205 (2d Cir.1979), and *770 cases cited (construing definition of confusion under § 43[a] of the Lanham Act, 15 U.S.C. § 1125[a]. Requiring "confusion [only] as to the origin of the [product] ... read[s] the confusion requirement too narrowly.... The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement"). We need not now consider whether the requirement of confusion as to source or origin in Massachusetts unfair competition law should be interpreted to include confusion as to sponsorship because such an interpretation does not assist DCI in its claim.
The courts which have expanded the concept of confusion to include affiliation, sponsorship, connection, and the like within the ambit of unfair competition law have done so to extend protection to plaintiffs, in appropriate circumstances, where the defendant is involved in a noncompeting endeavor. See 2 J.T. McCarthy, Trademarks and Unfair Competition, supra at § 24:3(C). See also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., supra at 205. The master found that both shows, DATACOMM and INTERFACE, were in fierce competition with each other. His findings relative to lack of source confusion indicate that it was quite unlikely that exhibitors and attendees or prospective exhibitors or attendees thought DATACOMM '76 was sponsored by, affiliated with, or in some way approved by DCI.[7] It is evident, therefore, *771 that the broader notion of confusion we have discussed is inapplicable to the facts of the instant case.[8]
The facts found by the master relative to the confusion which did exist do not amount to confusion as to source or origin. The distinction between the two shows in 1976 was apparent, and as stated, there was no likelihood that attendees or exhibitors might be misled into thinking DATACOMM '76 was sponsored by or run by DCI. In the circumstances of this case, therefore, confusion as to which of the two shows was the "continuing" show is not actionable under the tort of unfair competition.
DCI argues further that the adoption by User of certain features of the INTERFACE shows which DCI denominates as the shows' "trade dress" constitutes unfair competition. DCI primarily refers to the fact that the master found that User adopted items such as a fee schedule, program schedule, and floor plan for DATACOMM '76 that were similar to DCI's INTERFACE '75 fee schedule and floor plan and intentionally used a contract form for exhibitors which was similar to that used by DCI. We do not decide whether the term "trade dress" contemplates the items referred to by DCI because for DCI to recover under its "trade dress" theory it must show that these features had acquired secondary meaning such that there was a likelihood that confusion as to its source would arise by the defendants' adoption of them.[9]
*772 It is evident from the master's findings that these features had not acquired any special significance as applied to DCI, were not associated in the public's mind to any extent with DCI, and that no deception of the public resulted from DATACOMM '76's use of these features. See Randolph Ref. Corp. v. Shapiro, 333 Mass. 506, 508 (1956); Jenney Mfr. Co. v. Leader Filling Stations Corp., 291 Mass. 394, 398 (1935). Consequently, it is apparent that no secondary meaning attached to the features.
In view of the master's finding that there was no confusion as to the source or origin of either show, any palming off claim would also fail.
Finally, DCI argues that the defendants, as "second comers" to the data communications trade show market had a duty to distinguish their show to avoid confusion. It is of course true that second comers have such a duty. Staples Coal Co. v. City Fuel Co., 316 Mass. 503, 507 (1944), and cases cited. Assuming arguendo that the defendants were in fact second comers to this market, DCI's contention is answered again by the master's finding that there was no confusion as to the source of either show, and that the origin of the features discussed was unmistakably made clear. The defendants successfully distinguished their show and avoided confusion.
3. Comparison of marks DATACOMM and INTERFACE. DCI and Adelson argue that the master's finding that the name DATACOMM '76 bore no resemblance to the name INTERFACE '7- is clearly erroneous in light of his additional finding that DCI's show was officially named Data Communications INTERFACE '7- and was known as "The DATACOMM SHOW or THE INTERFACE SHOW." See Chase v. Pevear, 383 Mass. 350, 359 (1981). We do not agree. The master's numerous and detailed findings include that: (1) although Data Communications INTERFACE was the official name of DCI's shows, it was known most commonly and popularly as "INTERFACE" and when the show's official title was used, "INTERFACE" appeared in boldface; (2) DCI emphasized the name INTERFACE extensively in TDCU prior to the sale of the magazine to Computerworld and regularly in show promotional *773 material; (3) after sale of TDCU, DCI increased its emphasis on the name INTERFACE; (4) in its application for Federal service mark registration, DCI disclaimed protection for the words, "Data Communications," and (5) in a verified complaint DCI filed in an unrelated unfair competition action in 1978, Adelson swore that the show's name was INTERFACE "from the beginning and the name had `at all times' been emphasized in its shows, its advertising," so that INTERFACE was clearly identified in the computer and communication industry and among the exhibitors and attendees. In context, therefore, the additional finding that some members of the public were familiar with the official title of the INTERFACE shows does not render the findings contradictory or inconsistent.
DCI and Adelson maintain further that, in considering the issue of similarity of marks, the comparison between INTERFACE and DATACOMM was wrong as a matter of law and suggest that the DATACOMM SHOW and DATA COMMUNICATIONS INTERFACE '76 were names more properly compared with the defendants' show title. They argue that it was error for the master to "dissect" the name of DCI's show and focus on INTERFACE, since "in an action for unfair competition the entire image of the services and product must be considered." It is clear from the master's findings that he did consider the entire image of the services, found that INTERFACE was the dominant feature of the shows' name, and concluded that the shows were known as INTERFACE.
4. Damages assessed against DCI and Adelson relative to User's successful counterclaim. DCI and Adelson challenge the following damages awarded User as a plaintiff-in-counterclaim.
a. For conversion of circulation list copy. User was awarded $4,000 for DCI's conversion of a copy of a magazine circulation list Computerworld purchased from Capitol Bank in 1975 when it bought TDCU, and $6,250 for legal fees expended in connection with DCI's wrongful use of the list copy. DCI and Adelson allege that it was error for the master to find that DCI converted the copy, and argue that the facts demonstrate instead that DCI *774 had maintained lawful possession of the copy. The master found the following. Computerworld purchased at foreclosure all of the assets of Trends which had been involved in the production of TDCU including all known copies of circulation lists. The circulation lists had been prepared for, billed to, and paid for by Trends. The person who prepared and maintained the list had never heard of DCI, which at that time had no independent financial existence. DCI nevertheless obtained a copy of the list, made use of it, and refused to turn it over to Computerworld. When Trends refused to relinquish a carbon copy of TDCU's circulation list to Computerworld, stating that the copy belonged to DCI, Computerworld filed a complaint against DCI in Bankruptcy Court. Adelson produced a copy of the list in the course of his deposition in that case and testified that it was the only copy in DCI's possession. Relying on Adelson's sworn representation concerning that copy, Computerworld agreed to settle the suit in exchange for the copy. As a result, Computerworld dismissed its complaint and withdrew its objection to DCI's reorganization plan. DCI turned over the copy and entered into a stipulated agreement with Computerworld, which provided that DCI was in possession of the copy and had "this day delivered [to Computerworld] said copy." DCI, however, possessed a carbon copy of the list, which it continued to retain and use to promote INTERFACE '76. DCI and Adelson base their argument on the contention, not found by the master, that Adelson indicated at his deposition that the copy produced might not be the only list in DCI's possession. They state that DCI's agreement with Computerworld only contemplated their relinquishing control of the copy produced at the deposition, and did not extinguish DCI's property interest in the carbon copy. Even if this argument were open to DCI and Adelson on the record before us, see Riverview Homes, Inc. v. Case, 11 Mass. App. Ct. 974 (1981) (unreported evidence or evidence not appearing in the record is valueless), it would fail.
The master's findings establish that Computerworld purchased all forms of the list and that DCI, inferentially, had no rights in it. Even were this not the case, the settlement of the *775 claim against DCI in the Bankruptcy Court would have extinguished any vestigial rights of DCI in the list.[10]
b. For abuse of process. User was awarded $4,500 for legal fees incurred in defending against the temporary restraining order obtained by DCI, as part of the damages sustained due to abuse of process. DCI and Adelson incorrectly contend that the facts found by the master do not constitute abuse of process.
The master found that Adelson, on behalf of DCI, knowingly misstated the facts in the verified complaint. Adelson alleged there that the name DATA COMMUNICATIONS '7- was exclusively identified with DCI as indicating DCI's trade show. The master found that Adelson knew at the time that DCI's show was never popularly identified as such, and was commonly referred to by DCI and Adelson as INTERFACE. DCI obtained a temporary restraining order enjoining User and Computerworld from using the name DATACOMM '76 to promote their trade show. Shortly thereafter, Adelson told a witness that he "doubted seriously that anyone could change its name and promote a show with a new name in sixty days." The master found that DCI's actions immediately following the issuance of the restraining order manifested its intention to use the litigation as a marketing tool against the DATACOMM show and launched a promotional plan which insinuated that DATACOMM '76 would not take place. Finally, the master found that DCI, largely through Adelson's actions, caused "substantial disruption and damage to [User]."
To prevail on an abuse of process claim "it must appear that the process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed." Beecy v. Pucciarelli, 387 Mass. 589, 595 (1982), quoting Quaranto v. Silverman, 345 Mass. 423, 426 (1963). The essential elements of the tort are "(1) `process' was used; (2) for an ulterior *776 or illegitimate purpose; (3) resulting in damage." Jones v. Brockton Pub. Mkts., Inc., 369 Mass. 387, 389 (1975). Stromberg v. Costello, 456 F. Supp. 848, 849 (D. Mass. 1978). All these elements are supported by the master's findings.
DCI and Adelson contend that no "process" was utilized, since the alleged abuse concerned the issuance of an injunction and that this court has previously declined to "broaden our definition of process to include injunctions." Jones v. Brockton Pub. Mkts., Inc., supra at 390. The master, however, based his findings on misrepresentations in DCI's initial verified complaint instituting the suit. See id. at n. 2.
The master's findings concerning DCI and Adelson's knowing misrepresentations in the complaint, coupled with his findings concerning their behavior in emphasizing the litigation in marketing, support the conclusion that the action was instituted for an ulterior motive. See Quaranto v. Silverman, supra at 427; Lorusso v. Bloom, 321 Mass. 9, 10 (1947); Restatement (Second) of Torts § 682 comment a (1977). The fact that DCI's unfair competition action was instituted at least in part as a marketing tool shows a misuse of the legal process. Compare Jones v. Brockton Pub. Mkts., Inc., supra. As there is also a finding of damage, an essential element of this tort, Quaranto v. Silverman, supra, we find no error.
c. Other damages. The master awarded User $15,000 for injuries sustained due to the "misconduct and the culpable acts committed by [DCI and Adelson]" which were in addition to those sustained due to DCI and Adelson's misuse of the circulation list copy. The master made findings clarifying this award in his report after recommittal. The award was largely based on his finding of a $35,000 shortfall in expected exhibitor fees for DATACOMM '76. The master found that certain business decisions of User contributed to its failure to achieve the anticipated income and could "not find that the [entire] $35,000 shortfall was a direct result of [DCI and Adelson's] unfair method of competition or deceptive trade practices." Nevertheless, he found that DCI caused User to suffer "substantial disruption and damage," principally through Adelson's activities on DCI's behalf. He specified some of the misconduct *777 and culpable acts from which the damage flowed and reasserted his belief that $15,000 reasonably represents "the loss sustained by [User]."
In the case of business torts "an element of uncertainty in the assessment of damages is not a bar to their recovery." National Merchandising Corp. v. Leyden, 370 Mass. 425, 430 (1976). An "award of damages can stand on less than substantial evidence ... particularly [in] the case of business torts, where the critical focus is on the wrongfulness of the defendant's conduct." Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc., 14 Mass. App. Ct. 396, 426 (1982), citing Randall v. Peerless Motor Car Co., 212 Mass. 352 (1912). There was no error.
d. For annual bond premiums paid by User. User was awarded $3,500 for bond premiums it paid between 1976 and 1982. User had successfully obtained a preliminary injunction enjoining DCI and Adelson from using or selling the circulation list copy they wrongfully retained. As a condition of the injunction, the judge required User to post a $50,000 bond at an annual premium of $500. See Mass. R. Civ. P. 65 (c), 365 Mass. 832 (1974). Since the master found that the list lost most of its value after January, 1976, DCI and Adelson assert that it is inequitable to assess them the costs of maintaining the injunction past 1976, as they allege that payment of the bond premium after that date was a voluntary choice of User. User's continued payment of bond premiums during the pendency of the action was not merely "voluntary." To argue to the contrary borders on the frivolous.
5. User's Cross Appeal.
a. Claim under G.L.c. 93A, § 11. After the master's report on liability was confirmed, User was allowed to amend its counterclaim by alleging violations of G.L.c. 93A, § 11. In his report on damages, the master made no specific findings regarding this claim. Based on the factual findings in the liability report and the report on damages, a judge ruled that the acts of DCI and Adelson did not constitute a violation of G.L.c. 93A. We hold, however, that the master's findings do demonstrate a violation of G.L.c. 93A.
*778 General Laws c. 93A, § 2 (a) (1984 ed.) makes unlawful any "[u]nfair ... acts or practices in the conduct of any trade or commerce." Although the statute does not itself define what constitutes an unfair act or practice made unlawful by § 2 (a), Commonwealth v. DeCotis, 366 Mass. 234, 241 (1974), courts are to be guided by the interpretation given to those terms by the Federal Trade Commission (FTC) under the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) (1982), and by the Massachusetts Attorney General. See G.L.c. 93A, § 2 (b), (c) (1984 ed.). Relying on FTC interpretations, this court has stated that the following are "considerations to be used in determining whether a practice is to be deemed unfair: `(1) whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) ... is immoral, unethical, oppressive, or unscrupulous; (3) ... causes substantial injury [to] ... competitors or other businessmen.'" PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975), quoting 29 Fed. Reg. 8325, 8355 (1964). The Attorney General's Rules and Regulations provide a similarly broad contention, "[A]n act or practice is a violation of Chapter 93A, Section 2 if: ... [i]t is oppressive or otherwise unconscionable in any respect." 940 Code Mass. Regs. § 3:16 (1978).
This court has underscored the broad impact of c. 93A as creating "new substantive rights" and providing relief which is "in addition to, and not an alternative to, traditional tort ... remedies." Linthicum v. Archambault, 379 Mass. 381, 383 (1979), and cases cited. Consequently, while it is clear that common law actions for fraud and deceit are within the contemplation of an "unfair act" under the statute, it is equally well established that the definition of the term under c. 93A goes far beyond the scope of these common law actions. See Slaney v. Westwood Auto, Inc., 366 Mass. 688, 703 (1975).
The master found that Adelson identified the photo-reduced copy of the circulation list as the only one in DCI's possession, that in reasonable reliance on that representation Computerworld settled its suit, and that at the time of Adelson's deposition DCI retained the carbon copy of the list. He specifically *779 found that the carbon copy not produced at the deposition was "wrongfully withheld." The master also found that DCI commenced an action on oath which misstated a fact and was used as a marketing tool to cast doubt on whether the DATACOMM '76 show would ever occur. In addition, the finding that Adelson knowingly made a false representation to Computerworld concerning DCI's possession of the carbon copy gives rise to a reasonable inference that the false representation was made to induce Computerworld to drop its suit while DCI retained use of the list. It is clear that the type of misconduct found by the master falls within the concept of "unfair acts" prohibited by G.L.c. 93A. See Manning v. Zuckerman, 388 Mass. 8, 12 (1983) (in enacting c. 93A, the Legislature "strove to encourage more equitable behavior in the marketplace" and by the addition of § 11 by St. 1972, c. 614, § 2, these protections were extended to those engaged in trade or commerce in business transactions with others similarly engaged).[11]
User argues that it is entitled to an award of multiple damages under G.L.c. 93A, § 11 (1984 ed.), which provides that "[i]f the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of ... section two." We have stated that G.L.c. 93A "ties liability for multiple damages to the degree of the defendant's culpability by creating two classes of defendants." International Fidelity Ins. Co. v. Wilson, 387 Mass. 841, 853 (1983). Those defendants who have committed "relatively innocent violations" of the statute are not liable for multiple damages, while a second class of defendants who have committed "willful or knowing" violations are. Id.
*780 Actions involving fraudulent representations in knowing disregard of the truth encompass culpable, "willful" behavior under the statute. Compare Linthicum v. Archambault, 379 Mass. 381, 388 (1979), and Jeffco Fibres, Inc. v. Dario Diesel Serv., Inc., 13 Mass. App. Ct. 1029, 1031 (1982). We have already said that the master's findings concerning Adelson's statements that the copy of the circulation list produced was the only one DCI had, support a conclusion that this was a knowing misrepresentation. Moreover, Adelson's misstatement in DCI's verified complaint was explicitly found to be "knowing" by the master. The master found that the acts establishing liability on the abuse of process claim against DCI and Adelson were intentional. For example, he found that DCI intended to use the litigation as a marketing tool. We conclude that these acts were "knowing" in the sense of the statute, and that multiple damages are therefore appropriate.
Having demonstrated a violation of G.L.c. 93A, § 11, User is, of course, entitled to reasonable attorney's fees and costs. See Linthicum v. Archambault, supra at 388. User has already been awarded attorney's fees of $6,250 in connection with the misuse of the circulation list.[12] User is not entitled to a duplicative award. The award of $4,500 in connection with the abuse of process claim is recovery for part of the damage sustained by User. As an element of damages it is subject to the multiplier provisions of G.L.c. 93A. On remand, the judge is to assess multiple damages and such attorney's fees and costs as are appropriate.
b. Claim under G.L.c. 231, § 6F. General Laws c. 231, § 6F (1984 ed.), allows a party in a civil action to recover its *781 "reasonable counsel fees and other costs and expenses incurred" where "all or substantially all of the claims, defenses ... whether of a factual, legal or mixed nature, made by any party ... were wholly insubstantial, frivolous and not advanced in good faith." The judge in his order pursuant to User's motion under G.L.c. 231, § 6F, found for DCI.[13] There was no error.
The master's findings support a conclusion that the bulk of DCI's claims in its unfair competition action against User and Computerworld, as well as its defenses to User's counterclaim were not "wholly insubstantial, frivolous, and not advanced in good faith." DCI's complaint sets forth essentially two basic claims as part of its unfair competition action. The first is that the defendants' promotion and operation of DATACOMM '76 was confusing and misleading and created confusion as to which show was which. While the master found there was no confusion as to source, he found evidence of confusion as to which show was ongoing. Although we hold today that such confusion cannot sustain a successful unfair competition action, the question was subject to debate. See G.L.c. 231, § 6F ("No finding shall be made that any claim, defense ... was *782 wholly insubstantial, frivolous and not advanced in good faith solely because a novel or unusual argument or principle of law was advanced in support thereof").
DCI's second claim basically is that DATACOMM '76 copied features of the INTERFACE shows which had acquired secondary meaning. The master found that, in fact, User and Computerworld had copied the features complained of. The question whether the features copied were protectable was plainly not an insubstantial or frivolous one.
The master found that DCI's verified complaint contained a known misstatement and we have earlier discussed the detailed facts found which substantiate this. Clearly a claim founded upon this allegation would be insubstantial, frivolous, and certainly in bad faith under G.L.c. 231, § 6F. This is, however, but one relatively minor aspect of DCI's claims. The statute states that relief may be granted on the court's finding that "all or substantially all of the claims ... were wholly insubstantial, frivolous and not in good faith" (emphasis added). Although DCI and Adelson's misconduct is clearly reprehensible, it does not appear to have permeated "substantially all" of DCI's claims. Neither is it readily apparent that DCI's claims are "wholly insubstantial" by virtue of this misrepresentation. In light of this we cannot say the judge abused his discretion in denying relief under G.L.c. 231, § 6F.
We affirm the judgment in so far as it pertains to DCI's unfair competition action. We reverse so much of the judgment on User's counterclaim as denied relief under G.L.c. 93A, § 11. The case is remanded for determination of multiple damages, attorney's fees and costs under c. 93A, § 11, in accordance with this opinion. In all other respects the judgment on the counterclaim is affirmed.
So ordered.
NOTES
[1] DataComm User, Inc.
[2] The judge struck one finding from the report.
[3] This was the Superior Court rule in effect in 1980 when the master submitted his final report on liability. Rule 49 (7) of the Superior Court has been superseded. See Rule 49 of the Superior Court, as amended (1985). See also Mass. R. Civ. P. 53 (h), as amended, 386 Mass. 1236 (1982).
[4] Joint motions to extend time for filing objections to the master's final report on the damages phase were granted. There is no suggestion in the briefs of any of the parties that the objections filed in 1983 were untimely.
[5] The master found that DATACOMM '76 stressed its relationship to TDCU and exhibitors were told that DATACOMM '76 "[was] brought to the trade `by the same magazine and staff that had sponsored successful [shows] since 1973.'" An editorial in TDCU stated "[TDCU] will be back at the Rivergate Conference Center in New Orleans to sponsor its annual national conference exposition  DATACOMM 76." User promoted the names of the former Trends staff members who now worked for Computerworld.
[6] Although DCI owns a Federal service mark registration for the mark "Interface," DCI makes no claim for service mark or trademark infringement. DCI's action is essentially an unfair competition claim under Massachusetts common law. No violation of G.L.c. 93A (1984 ed.), or any other Massachusetts statute, or of the Lanham Act, 15 U.S.C. §§ 1051 et seq. (1982 & Supp. II 1984), or any other Federal statute, has been raised.
[7] For example, the master found that the promotional literature "from the two competitors would inform an interested prospect that DATACOMM 76 was sponsored by [TDCU] magazine published by [Computerworld's subsidiary]; that it was managed by... a division of Computerworld, Inc., and that it would be held in February, 1976 in New Orleans." TDCU thus made its new status as a Computerworld subsidiary plain. INTERFACE on the other hand was presented as cosponsored by Datamation magazine and was to be held in Miami in March.

He further found that the trade press reflected "the clear distinction" between the two shows. In finding that exhibitors and attendees had a "clear choice as to whether or not to attend both shows, neither show, or one show," the master found this choice to be "affected by one or more of the significant differences between the shows." User never implied it was continuing INTERFACE shows but candidly stated that DATACOMM '76 would contain essential ingredients of what had become identified with prior shows.
[8] DCI's arguments concerning so-called "reverse passing off" are equally inapplicable. See 2 J.T. McCarthy, Trademarks and Unfair Competition, supra at § 23:1.
[9] DCI does not maintain that the features discussed are nonfunctional or arbitrary. See Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695, 702 (5th Cir.1981), cert. denied, 457 U.S. 1126 (1982), quoted in 1 J.T. McCarthy, Trademarks and Unfair Competition, supra § 8:2, at 287 (if features sought to be protected "are arbitrary and serve no function either to describe the production assist in its effective packaging, there is no reason to require a plaintiff [to demonstrate secondary meaning].") Consequently, if DCI cannot demonstrate passing off, it must show secondary meaning to succeed in its claim. Compare Professional Economics, Inc. v. Professional Economic Servs., Inc., supra at 73-74, and case cited.
[10] We observe that Capitol Bank's loan was to Trends and DCI jointly and that the assets of both entities were pledged as collateral. The master found that, when Capitol Bank foreclosed, it took possession of all the assets, which presumably included those of both Trends and DCI. Even assuming that a copy of the circulation list was indeed an asset of DCI, it would appear that after foreclosure the list belonged to the bank.
[11] DCI and Adelson contend that User's claim for relief under c. 93A, § 11, must fail as § 11 requires proof of loss of money or property and the master's findings demonstrate that no damages resulted from the acts allegedly violative of the statute. We need state no more than that the master found and awarded damages, which we have upheld, of $4,000 concerning DCI's wrongful use of the circulation list and $15,000 for lost income largely resulting from the facts giving rise to a finding of abuse of process.
[12] No question is raised regarding the propriety of awarding attorney's fees as an element of damages in conversion. See Lincoln St. Realty Co. v. Green, 374 Mass. 630, 631 (1978) (in general, a prevailing party may not recover attorney's fees in the absence of statutory authorization or contractual provision); Harrison v. Textron, Inc., 367 Mass. 540, 554-555 (1975), and cases cited. Although User would not ordinarily be entitled to such an award, it is not necessary to amend the judgment since we have concluded that User is entitled to reasonable attorney's fees under G.L.c. 93A, § 11.
[13] After receiving the master's final report on counterclaim damages, the judge ordered the report recommitted for findings, among others, on User's motion under G.L.c. 231, § 6F. User focuses on the portion of the statute which reads "the court may determine, after a hearing, as a separate and distinct finding, that all or substantially all of the claims ... were wholly insubstantial, frivolous and not advanced in good faith. The court shall include in such finding the specific facts and reasons on which the finding is based" (emphasis added). User argues that the judge "merely issued an order" based on the master's report after recommittal, and thereby erroneously delegated his function under the statute to the master. An examination of the judge's order reveals that the judge indeed made an independent decision concerning User's motion. The order states "[a]fter reviewing the Master's original Report and the Report submitted by the Master subsequent to recommittal the Court finds for [(DCI) on User's G.L.c. 231, § 6F motion]."

User also alleges error because the judge did not include "specific facts and reasons" in his order. General Laws c. 231, § 6F, requires that the court include in its order awarding attorney's fees "specific facts and reasons" for its finding that the action in question was "wholly insubstantial, frivolous and not advanced in good faith." It does not require a judge who declines to award attorney's fees to make specific findings as the reasons for refusing to do so.