Botsford, J.
After purchasing a home that was ultimately leveled due to troubles with the foundation, the plaintiffs, Jonathan B. White and Heidi R. White (the Whites), filed a thirteen-count complaint against the defendants. The defendants, Milton M. Feinson and Evelyne L. Feinson (the Feinsons), have filed this motion for summary judgment pursuant to Mass.R.Civ.P. 56(c) on the following counts against them: breach of contract (count VII), breach of the covenant of good faith and fair dealing (count VIII), negligent misrepresentation (count IX), intentional or negligent infliction of emotional distress (count X), loss of use and enjoyment (count XI), and abuse of process (against Milton Feinson only) (count XII). For the following reasons, the Feinsons’ motion for summary judgment is ALLOWED in part and DENIED in part.
BACKGROUND
Viewed in a light most favorable to the plaintiffs, and making all reasonable inferences in their favor, the summary judgment record indicates the following facts:
In or around the first half of 1991, the Feinsons listed their single family home located at 28 Nardel Road, Newton, Massachusetts (the house) for sale with defendant Otero & Pearl Associates, Ltd. (Otero & Pearl), a real estate broker. The Feinsons thereafter commissioned an inspection of the house. Rene Mugnier (Mugnier) conducted the inspection. He inspected the exterior of the home which consisted of masonry resting on concrete foundation walls. He noticed a number of cracks in both the masonry and the foundation, some of which had re-cracked after having been repaired. In the garage, the inspector noted that the slab on grade and several of the partitions which it supported had badly settled, and he also noticed “huge cracks” in the slab. Finally, he inspected the main floor of the house which revealed a substantial amount of settlement in the floors and door openings.
Based on these observations, Mugnier concluded in a report (the report) dated June 18, 1991, and forwarded to the Feinsons, that “when the house was built the contractor did not rest the footings and slab on grade in good undisturbed bearing soil. Subsequently, settlements have occurred in this house throughout its life. As mentioned above, we noticed that some cracks have been repaired and have cracked again, which indicate that there is a continuation of the settlement, and we would not guarantee that the house has stopped settling.” Although the inspectors did not indicate, at the time, that immediate measures needed to be taken to repair the home, they did suggest that annual inspections be conducted to monitor the situation. Thereafter, the Feinsons took the house off the market.
In approximately the spring of 1998, the house was to be re-listed with the broker. Before the house was put back on the market, however, the defendant Barbara Diamond (Diamond), the listing broker at Otero & Pearl, had discussions with the Whites and showed them a fact sheet of the house. The fact sheet, describing the house as a “Meticulously Maintained 9 Room Ranch,” was prepared by the brokers. The fact sheet makes no mention of the conclusions drawn by Mugnier in the report. While the summary judgment record indicates that Diamond knew that the home had been *284 inspected by Mugnier for settling, it is unclear whether she had actually seen the report detailing the results.
The Whites retained Judy Moses (Moses), a real estate agent, to act as a broker on their behalf. During a house visit prior to the closing, the Whites asked Diamond a number of questions about the condition of the swimming pool. The Feinsons ultimately agreed to repair the pool before the closing. Subsequent to that conversation, Moses asked Diamond if the house had “good bones.” Diamond acknowledged that it did.[3]
On or about July 17, 1998, the Whites signed an “Offer to Purchase Real Estate” (Offer to Purchase) and gave Diamond a $1000 deposit. The Offer to Purchase contained an inspection contingency addendum. In accordance with the Offer to Purchase, the Whites executed a purchase and sale agreement (P&S) on July 31, 1998, to purchase the property for $530,000. The P&S contained a merger clause,[4] and a warranty clause.[5] The rider to the P&S contained an inspection clause.[6] The Whites had the property inspected by the defendant ABC Home Inspection, Inc. On or about October 2, 1998, the closing took place when the Feinsons’ attorney delivered the deed to the Whites who accepted it. On or about October 2, 1998, the Whites’ attorney recorded the deed at the Middlesex Registry of Deeds.
Subsequently, the Whites became aware of foundation problems with the house and retained Mugnier to conduct another inspection.[7] Mugnier wrote a report of his observations which is dated January 7, 1999. After conducting a full structural inspection, Mugnier concluded, in another report dated May 18, 1999, that the house had significant and material foundation and structural problems. Between Mugnier’s first and second reports to the Whites, on or about March 12, 1999, Milton Feinson filed a verified complaint for declaratory and injunctive relief in this court, seeking to prevent the demolition of the house until he had an opportunity to have it inspected. A permanent injunction was granted on April 15, 1999, which allowed the Feinsons to inspect the house “up to and including April 30, 1999.” Thereafter, the Whites were permitted to demolish the house and the defendants were barred from raising a defense of spoliation of-evidence. The Whites subsequently demolished the house.[8]
DISCUSSION
Summary judgment is appropriate when no material facts are in dispute and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Highland Ins. Co. v. Aerovox, Inc., 424 Mass. 226, 232 (1997). “(A) party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates, by reference to material described in Mass.R.Civ.P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “Once the defendants [meet1 their burden in moving for summary judgment, the burden shift[s] to the plaintiffs] to show with admissible evidence the existence of a dispute as to material facts.” Quigley v. Bay State Graphics, Inc., 427 Mass. 455, 459 (1998), quoting Godbout v. Cousens, 396 Mass. 254, 261 (1985). The facts are viewed in the light most favorable to the party that is opposing to the motion for summary judgment, here, the Whites. See Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 459 (1997).
I. Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing
The general rule in Massachusetts relating to the sale of property states that “the acceptance of a deed of conveyance of land from one who has previously contracted to sell it, discharges the contractual duties of the seller to the party so accepting except such as are embodied in the deed . . .” McMahon v. M&D Builders, Inc., 360 Mass. 54, 59 (1971), quoting Restatement (First) of Contracts, §413 (1932). See Solomon v. Birger, 19 Mass.App.Ct. 634, 641 (1985). The exception to this doctrine of merger provides that promises which are additional or collateral to the main, promise to convey contained in the purchase and sale agreement are not merged so long as they are not inconsistent with the deed. See McMahon, supra at 59. “Once the transaction is completed, the parties are well served by being allowed to go their separate ways. This does not mean that sellers have a license to lie and cheat. If there have been misrepresentations, there is an adequate remedy in tort ...” Solomon, supra at 643.
The Whites allege that the Feinsons breached a warranty of habitability which they assert is implied in the terms of the P&S. Their argument must be rejected. “Warranties of habitability are not normally implied in the transfer of a home from one purchaser to a subsequent one.” Solomon, supra at 638 n.7[9] While an express warranty of habitability in a purchase and sale agreement may be considered a collateral agreement that does not merge with the deed upon acceptance by the purchaser, the Whites do not point to any such express promise in the P&S at issue here. See id. at 644-46 (Brown, J., dissenting).
Moreover, even if one were to assume that an implied warranty of habitability may be an implied condition of a residential purchase and sale agreement, Clause 25 of the P&S is an acknowledgment by the Whites, as buyers, that they did not rely on any warranties not contained in the agreement itself. In these circumstances, it can not reasonably be concluded that the Whites are entitled to relief on a claim that the Feinsons breached a warranty of habitability.
The Whites’ second contract-related claim is that the Feinsons breached the covenant of good faith and fair dealing. “Every contract implies good faith and fair dealing between the parties to it.” Anthony’s Pier Four, *285 Inc. v. HBC Associates, 411 Mass. 451, 471 (1991) (citations omitted). The covenant provides “that neither party shall do anything that will have the effect of destroying or injuring the right of the other parly to receive the fruits of the contract. . .” Id. at 471-72. The covenant, however, “pertains to bad faith in the performance of a contract, not in its execution.” Sheehy v. Lipton Indus., Inc., 24 Mass.App.Ct. 188, 194 n.6 (1987). Since the Whites allege they were deceived into entering into the agreement to purchase the home, their claim concerns bad faith in the execution of the contract, not in its performance. Accordingly, the covenant of good faith and fair dealing does not apply in this situation and cannot be a successful ground upon which to assert a breach of contract claim.
Since there is no reasonable expectation that the Whites will be able to meet the Kourouvacilis standard by producing evidence on crucial elements of these claims, the Feinsons’ motion for summary judgment on the counts alleging breach of contract and breach of the covenant of good faith and fair dealing against them will be allowed.
II. Negligent Misrepresentation
Whether the record demonstrates a question of fact as to the Whites’ misrepresentation claim is a close call. In order to sustain this claim, the Whites must be able to show that the Feinsons misrepresented material facts to them which led them to purchase the house. SeeDanca v. Taunton Savings Bank, 385 Mass. 1, 7-8 (1982). The representations need not have been made willfully or knowingly as long as they were made negligently without due consideration having been given to their truthfulness. SeeAnzalone v. Strand, 14 Mass.App.Ct. 45, 49 (1982). A special obligation of forthrightness is placed on the sellers of a house when potential buyers ask specific questions about matters within their knowledge. See Maxwell v. Ratcltffe, 356 Mass. 560, 562-63 (1969)
The Whites assert that they relied on the Feinsons’ representation that the house was structurally sound. Specifically, the Whites contend that when the Feinsons’ broker, Diamond, agreed with their broker’s assertion that the house had “good bones,” they reasonably understood that statement to refer to the foundation and overall structural soundness. They further focus on the fact sheet, prepared by the brokers, stating that the house was a “Meticulously Maintained 9 Room Ranch,” as a representation made by the Feinsons that the house was in good condition. The Whites contend that had neither of these representations been made, they would not have purchased the house.
The Feinsons maintain that they never made any representations to the Whites. The Feinsons, however, engaged Diamond to sell their home. “If [a] principal knows facts unknown to a servant or other agent and which are relevant to a transaction which the agent is authorized to conduct, and, because of [her] justifiable ignorance, the agent makes a material misstatement of facts, the principal ... is subject to liability ... for a negligent misrepresentation, if he had reason to know the agent would make the statement.” Brandt v. Olympic Construction. Inc., 16 Mass.App.Ct. 913, 914 (1983), quoting Restatement (Second) of Agency §256(a) (1957). While Diamond may not have been specifically advised of the results of the inspection conducted by Mugnier in 1991, the Feinsons' knowledge of these reports can be imputed to her for these purposes. Further, there is evidence that Diamond knew why the inspection was being conducted and that it was she who recommended Mugnier to the Feinsons. The scope of Diamond’s authority in this instance and whether the Feinsons could reasonably have expected her to make such a representation, are questions of fact. See Sheehy, 24 Mass.App.Ct. at 193. Since a question as to the soundness of the structure was arguably directly raised by the Whites via their agent, Moses, Diamond may have had a special obligation to be more forthright as to her knowledge about the histoiy of the house. See Maxwell, 356 Mass, at 562-63. Whether her acknowledgment was an authorized and accurate representation is a question for a jury.
It is true, as the Feinsons argue, that the “good bones” comment can be viewed as puffery, see, e.g., Greenery Rehabilitation Group v. Antaramian, 36 Mass.App.Ct. 73, 75 (1994), or in any event a statement of Diamond’s personal opinion, and not an actionable statement of fact. See Yerid v. Mason, 341 Mass. 527, 530 (1960). On this record, however, I cannot conclude as a matter of law that the statement qualifies as exaggerated seller’s talk or opinion. Rather, the issue presents a dispute of fact for a jury or other factfinder to decide. See Restatement (Second) of Torts §§538A and 539 (1977).[10]
The argument might also be made that the “good bones” statement is fatally ambiguous: does it refer to the foundation or structural soundness of the house, as the Whites argue, or to something else. Again, the intent of the speaker and the meaning of the phrase present disputed factual issues. The assertion must be considered in the context of the whole situation and not in isolation. See Sheehy, 24 Mass.App.Ct. at 192.
The Whites further assert that the description “Meticulously Maintained” contained in the fact sheet was a misrepresentation. This argument is without merit. No reasonable fact-finder could conclude that the phrase in any way referred to the foundation or the overall structural soundness of the home. Given the “good bones” statement, however, this shortcoming is not harmful to the Whites’ claim.
There are numerous factual questions that remain in relation to the “good bones” statement. The Whites have submitted sufficient evidence to raise a question of material fact as to their claim of negligent misrepresentation. As such, the Feinsons’ motion for summary judgment will be denied as to the count for negligent misrepresentation.
*286 III.Intentional Infliction of Emotional Distress
In order to succeed on a claim of intentional infliction of emotional distress, the Whites must be able to establish "(1) that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct... (2) that the defendant’s conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the defendant were the cause of the plaintiffs distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it.” Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 466 (1997), quoting Payton v. Abbott Labs, 386 Mass. 540, 555 (1982). The Whites have failed to establish a genuine issue of material fact as to this claim.
“(W]hile summary judgment on a matter dealing with intent requires great circumspection, there must be some indication that a plaintiff, who will bear the burden at trial, can produce the requisite quantum of evidence to enable it to reach a jury with its claim.” Tetrault, supra at 467. The Whites have not demonstrated that they will be able to furnish evidence sufficient enough to meet the “extreme and outrageous” element of the tort. It is not enough to show “that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by ‘malice,’ or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort; rather, (Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.” Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987), quoting Restatement (Second) of Torts §46 comment d (1965) (internal punctuation omitted). Even putting a “harsh face” on the Feinsons’ actions by assuming for these purposes that they knew the foundation was unsound and intentionally failed to inform the Whites of this fact, thus prompting them to purchase the house, such acts are still insufficient to meet the extraordinarily rigorous standard required to make a prima facie showing for a claim of the intentional infliction of emotional distress. The Feinsons’ motion for summary judgment on the claim of the intentional infliction of emotional distress will therefore be allowed.
IV.Negligent Infliction of Emotional Distress
In order to recover for negligent infliction of emotional distress, the Whites must be able to establish that: (1) the Feinsons were negligent, (2) the Whites suffered emotional distress, (3) the emotional distress was caused by the Feinsons’ negligence, (4) the Whites experienced physical harm manifested by objective symptomatology and substantiated by expert medical testimony, and (5) a reasonable person would have suffered emotional distress under the circumstances of the case. See Payton, 386 Mass, at 556-57. “If the actor’s conduct is negligent as creating an unreasonable risk of causing either bodily harm or emotional disturbance to another, and it results in such emotional disturbance alone, without bodily harm or other compensable damage, the actor is not liable for such emotional disturbance.” Id. at 552. “[T]he harm need not be caused by impact or trauma: physical harm resulting from emotional stress is sufficient.” Id. In order to survive summary judgment, then, more than a mere assertion of physical harm is necessary.
In this case, the only allegation of any type of physical harm is that contained in Mrs. White’s affidavit proclaiming that she and Mr. White “have incurred and suffered physical and severe emotional distress because of the home’s foundation problems ...” She further notes that each has sought out medical care. The summary judgment record, however, does not include any affidavits from any treating physician or a description of any specific injury suffered. Given these shortcomings, the Whites have failed to present enough evidence to satisfy the Payton standard. See Sullivan v. Boston Gas Co., 414 Mass. 129, 137 (1993). Accordingly, the Feinsons’ motion for summary judgment on the claim of negligent infliction ■ of emotional distress will be allowed.
V.Loss of Use and Enjoyment
The Whites have included a count in the complaint alleging loss of use and enjoyment of their home. Loss of use and enjoyment, however, is a measure of damages, not a cause of action iteself. See, e.g., Omni Flying Club, Inc. v. Cessna Aircraft Co., 366 Mass. 154, 162 (1974); Schleissner v. Provincetown, 27 Mass.App.Ct. 392, 395 (1989). The count for loss of use and enjoyment will therefore be dismissed.
VI.Abuse of Process
Milton Feinson filed a complaint for declaratory and injunctive relief on March 12, 1999. The complaint sought a preliminary injunction restraining the Whites from demolishing the house or making any other substantial alterations to it until Feinson had an opportunity to have it inspected. The Whites have asserted a claim for abuse of process against Milton Feinson, alleging that he had an ulterior motive in filing the March 1999 complaint, that is, to prevent them from filing a complaint against the Feinsons.
In order to make out a claim for abuse of process, the following elements must be exhibited: (1) ‘process’ was used, (2) for an ulterior or illegitimate purpose, (3) resulting in damage. See Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 775-76 (1986). “(I]t must appear that the process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed.” Id. at 775. There is no evidence that Milton Feinson pursued the complaint for an ulterior motive. It appears instead that the purpose of the complaint was exactly the one stated. The Whites *287 have not offered any evidence to the contrary. As such, there is no reasonable expectation that the Whites could prove to a jury that Milton Feinson had an ulterior or illegitimate purpose for filing the complaint. See Kourouvacilis, 410 Mass, at 716. Milton Feinson’s motion for summary judgment on the Whites’ claim for abuse of process will therefore be allowed.
ORDER
For the foregoing reasons, Milton M. Feinson’s and Evelyne L. Feinson’s motion for summary judgment is hereby ALLOWED as to the counts against them alleging breach of contract, breach of the covenant of good faith and fair dealing, loss of use and enjoyment, intentional and negligent infliction of emotional distress, and abuse of process. The Feinsons' motion for summary judgment as to the count alleging negligent misrepresentation is DENIED.

 There is some dispute in the record as to where and when this conversation actually took place. However, the Feinsons do not dispute in their summary judgment memorandum that Diamond agreed, in some maimer, that the house had “good bones.”

Clause 13 of the P&S, labeled “Acceptance of Deed,” states:
The acceptance of a deed by the BUYER or his nominee as the case may be, shall be deemed to be a full performance and discharge of every agreement and obligation herein contained or expressed, except such as are. by the terms hereof to be performed after the delivery of said deed.

 Clause 25 of the P&S, labeled “Warranties and Representations,” states:
The BUYER acknowledges that the BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement or previously made in writing . . .

 Clause 36 to the Rider to the P&S states
The BUYERS acknowledge that they have had the property inspected by a person engaged in the business of conducting home inspections, and further acknowledges [sic] that said home inspection was made by a person of BUYERS' own choosing, and at BUYERS’ own cost and that they are satisfied with the results thereof. BUYERS acknowledge that the SELLER has given BUYERS access to the property for the purposes of inspection of the premises, and its systems, including mechanical, electrical, heating, and the like, and accept the property in “as is” condition . . .

 It is not clear from the record exactly when or how this discovery took place.

 Although it appears that the Whites were advised by a structural engineer that demolition of the house was their best option, the events leading up to the actual destruction of the house, and the date on which it was performed, are not clear from the record.

 See French v. Isham, 801 F.Sup. 913 (D.R.I. 1992), in which the court explains the policy underlying this proposition. In summary, the court states that to imply a warranty of habitability in the purchase of a home between ordinary lay people would leave the seller potentially liable for any defects, which they may or may not have known about, for many years to come. See id. at 918-19.

 Restatement (Second) of Torts §538A (1977) states:
A representation is one of opinion if it expresses only
(a) the belief of the maker, without certainty, as to the existence of a fact; or
(b) his judgment as to quality, value, authenticity, or other matters of judgment.
Restatement (Second) of Torts §539 (1977) states in pertinent part:
(1) A statement of opinion as to facts not disclosed and not otherwise known to the recipient may, if it is reasonable to do so, be interpreted by him as an implied statement
(a) that the facts known to the maker are not incompatible with his opinion: or
(b) that he knows facts sufficient to justify him in forming it.
On the question of puffery, I note that in the Greenery Rehabilitation Group case on which the Feinsons rely, the court ultimately concluded that the plaintiffs could not rely on their misrepresentation theory for reasons other than puffery. Greenery Rehabilitation Group v. Antaramian, 36 Mass.App.Ct. 73. 75-76 (1994).