Brian **FARLAND**, et al., Plaintiffs,

v.

**T & T FISHING CORP.**, et al., Defendants.

Civ. A. No. 85–0629 P.

United States District Court,
D. Rhode Island.

Jan. 27, 1988.

---

**701**

Joseph P. Flannery, Boston, Mass., Teresa Paiva, Newport, R.I., for plaintiffs.

Thomas A. Tarro, III, Providence, R.I., for T & T Fishing.

David Oliveira, Providence, R.I., for Community Loan.

Joseph Rothemich, Jr., Cranston, R.I., for Medway Marine.

Paul Reynolds, Providence, R.I., for Samuel Snow.

Alan Hanson, SBA, Providence, R.I., for SBA.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

The present case is before this court on remand from the United States Court of Appeals for the First Circuit. On appeal the First Circuit found itself "lacking sufficient facts to make a reasoned decision." *Farland v. T & T Fishing Group*, No. 86–1123, slip op. at 2 (1st Cir. November 12, 1986) [868 F.2d 1513]. While the First Circuit found no error in this district court's holding, 626 F.Supp. 1136, it became unsettled when questions raised at oral argument remained unanswered. Accordingly, it vacated the judgment of this court and remanded the case for further investigation into the facts.

## BACKGROUND

William Trotter desired to purchase a scalloper. To this end, Mr. Trotter, sole stockholder of T & T Fishing Corporation [hereinafter T & T], negotiated a loan for his company from Community Loan and Development Corporation [hereinafter Community]. This debt was secured by a preferred ship mortgage on the fishing vessel purchased by T & T, the Terry T. Mr. Trotter personally guaranteed T & T's debt to Community. Moreover, Community required as a condition on the loan that T & T insure the Terry T and name Community as the loss payee. As a result, T & T approached Samuel Snow, d/b/a Samuel Snow Insurance Company [hereinafter Snow], to procure the required insurance policy for the Terry T. Conforming to the common practices of the fishing industry, T & T intended to procure a policy that included both hull insurance and protection and indemnity [hereinafter P & I] insurance. Snow, acting as an agent of Medway Marine Corporation [hereinafter Medway], quoted T & T a premium and T & T paid for the insurance. For this consideration, T & T received a binder letter, dated October 2, 1980, indicating that Community had been named loss payee on the hull insurance and that P & I insurance had been issued covering eleven to thirteen men for $500,000.00 each. In fact, however, no insurance policy was ever issued.

On October 26, 1980, the Terry T sank, causing injuries to eight seamen, the plaintiffs in the present action. Informed that the Terry T had been uninsured T & T, in 1981, and Community, in 1983, filed separate lawsuits that were eventually consolidated in the Providence County Superior Court, C.A. Nos. 81–3591 and 83–4790 respectively. These suits named as defendants Snow, Medway and other insurance companies. Their Complaints alleged breach of contract and negligent failure to insure the Terry T.

Also in 1983, the injured seamen, after hiring Mr. Flannery as their attorney, filed suit against T & T in the United States District Court for the District of Massachusetts. T & T failed to defend this suit and on March 6, 1984, a default judgment as to liability was entered against it. On July 10, 1985, the damages to which the plaintiffs are entitled were assessed at $98,-000.00 plus interest. On September 11, 1985, the district judge entered judgment for the plaintiffs.

Two days after judgment was entered for the seamen in the District of Massachusetts, the actions pending in the Providence County Superior Court were settled. The settlement agreement involved the payment of $425,000.00 in exchange for both a release of defendants from any and all liability by T & T and Community and an indemnification of Snow and Medway by T & T for "any and all claims, demands, and actions of whatever kind that may be hereafter made or instituted against Samuel Snow and Medway Marine Corporation as a result of the sinking of the 'Terry T' or the attempt to procure insurance on the 'Terry T' or the cancellation of the binder of insurance referred to above." Release of All Claims, Plaintiffs' Exh. 2.

*The Possibility of Fraud*

At this point in the narrative the First Circuit paused, disturbed by the possibility of fraud. Explaining its hesitation, the First Circuit noted that

One disturbing possible scenario occurs to us, suggested by a consideration of the beneficiaries of the settlement and of the timing of events. Trotter ... had long known of the efforts of plaintiffs to reduce their claims to judgment. Indeed he supposedly had known of the default judgment against T & T for a year and one half. Trotter also was personally liable on T & T's note to Community. The broker and insurers were at risk on T & T's contract and negligence claims based on the failure to obtain insurance. It would therefore not be beyond conjecture that T & T through Trotter, the broker and his insurers, and Community would find a complete continuity of interests in (1) putting Community in its bargained for position as hull insurance payee, (2) discharging *pro tanto* Trotter's personal liability, and (3) limiting the broker and insurers to a settlement based only on the failure to obtain hull insurance, while giving a complete release from claims relating to P & I insurance.

Id. at 5.

The timing of events to which the First Circuit refers may be chronicled from July 5, 1985. On that date, Mr. Trotter stopped by the office of Mr. Flannery, the attorney of the injured seamen. Transcript of Hearing on September 21, 1987, at 8; see also Transcript of Hearing on September 18, 1987, at 103. At this meeting, according to Mr. Flannery's testimony,[1] Mr. Trotter informed him that an offer to settle the case had been made. Snow and Medway had

---

1. The court notes that conflicting testimony on the nature of this meeting was given at the hearing. Mr. Trotter claimed that he never made the statements to which Mr. Flannery has testified. Mr. Trotter testified that "I didn't talk to him, he talked to me. He asked me how I was doing. And I says, I didn't know anything that was going on. To call my attorneys." Transcript of Hearing on September 18, 1987, at 104. Mr. Trotter explained his visit in two sen-

tences: "I stopped in there to ask him a question. It had nothing to do with the case." Id. at 103. Contrasting these sparse and unexplained remarks of Mr. Trotter with the extensive and detailed testimony of Mr. Flannery as well as intangibles of credibility that accompany live testimony, this court adopts the remarks of Mr. Flannery as accurately characterizing the conversation that took place between them.

offered $325,000.00. Mr. Trotter, however, stated that he felt this amount was inadequate. Transcript of Hearing on September 21, 1987, at 9. Mr. Trotter also told Mr. Flannery that the seamen's claims would be paid out of the settlement. Id. at 16. "[T]hat the seamen's claims would be included in the damages of the corporation." Id. at 18.

Nor was this the first time Mr. Flannery had been told that the seamen's claims would be protected. Mr. Colaluca, one of the attorneys for Mr. Trotter, acting on behalf of Mr. Trotter, discussed the pending lawsuits with Mr. Flannery in October of 1983. During this conversation, Mr. Flannery came to understand that "[t]he seamen's claims would be included as damages of the corporation and as such would be paid out of any settlement." Id. at 21. Mr. Colaluca specifically told Mr. Flannery that they had brought suit for all the claims based on the missing insurance, including P & I. Id. at 30.

Relying on Mr. Trotter's representations that the interests of the seamen were being protected in the state court action, Mr. Flannery did not intervene in this suit. Moreover, five days after his discussion with Mr. Trotter, when the District Court of Massachusetts reported an assessment of damages incurred by the seamen, Mr. Flannery sent this assessment to Mr. Trotter. Id. at 8. Finally, a week after sending this report, Mr. Flannery called Mr. Trotter to verify that he had received it. Id. at 9. Mr. Trotter informed Mr. Flannery that he had received it and that he had forwarded it to his attorneys. Id. At no time during these exchanges did Mr. Trotter indicate that he was not acting to protect the interests of the seamen.

### The Reality of Fraud

Mr. Trotter's representations, however, were misrepresentations. The claims of the seamen were not included in the settlement of the state court action. The question thus arises whether these misrepresentations amounted to fraud.

■ A misrepresentation is fraudulent if the maker, *inter alia*, "knows or believes that the matter is not as he represents it to be" or "knows or believes [it] to be materially misleading because of his failure to state additional or qualifying matter." Restatement, Second, Torts §§ 526(a), 529. In the present case there is convincing evidence that the misrepresentations of Mr. Trotter were fraudulent. A letter dated May 9, 1985, from Mr. Reynolds, Snow's attorney, to another insurance company involved in the action, reported that during a telephone conversation on May 8, 1985, with Mr. Tarro, another of Mr. Trotter's attorneys, Mr. Reynolds

> "told [Mr. Tarro] that if the case were settled that the pending personal injury claims in the United States District Court in Boston would have to be included. He was not reluctant to have these claims included since he feels the corporation is insolvent and the only request he would make in this regard is that the money, if a settlement was reached, be paid to the individual Trotters rather than the corporation. I told him that I didn't see that this was any particular problem."

Letter of Mr. Reynolds to Mr. Attilli, Plaintiffs' Exh. 6. Clearly, this letter indicates that the interests of the seamen were not being protected as represented by Mr. Trotter two months later.

Nor can Mr. Trotter claim not to have known the substance of these negotiations. The rules of agency are clear: "the liability of a principal is affected by the knowledge of an agent concerning a matter as to which he acts within his power to bind the principal or upon which it is his duty to give the principal information." Restatement, Second, Agency § 272. The major exception to this general rule, that a principal is not liable for such knowledge when the agent acts adversely to the principal, does not apply. Id. at § 282. Accordingly, as Mr. Trotter's attorney, Mr. Tarro, certainly had knowledge of the conversation with Mr. Reynolds, this knowledge may be attributed to Mr. Trotter with the result that Mr. Trotter's misrepresentations to Mr. Flannery were fraudulent.

It is a general rule that:

One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.

Restatement, Second, Torts § 531. Mr. Flannery acting in his capacity as agent for the seamen relied on Mr. Trotter's misrepresentations when he decided not to intervene in the state court action and when he failed to carefully monitor the progress of the settlement negotiations. Mr. Flannery's reliance was justifiable because the matter misrepresented by Mr. Trotter was material. Id. at § 538. Mr. Trotter knew or had reason to know that Mr. Flannery would regard or would be likely to regard the matter as important in determining his choice of action. Id. Moreover, and this alone is sufficient, a reasonable person would attach importance to this matter's existence or nonexistence in determining his choice of action in the transaction in question. Id.; see also id. at § 544. Finally, the pecuniary loss suffered by the seamen is the amount of the judgment they received against T & T, now judgment-proof.

### Parties and Agents

Without proceeding further, it appears the scenario suggested by the First Circuit is substantially correct: the settlement involved fraud. It is from the effects of this fraud that plaintiffs seek relief. One possible remedy would be to place the plaintiffs in the position in which they would have been had they not been excluded from it as a result of the fraudulent misrepresentations. While this remedy is possible, it is not viable. The position in which the plaintiffs would have been, absent the fraud, is simply beyond the ken of this court. The concerns of this court are with the events of this world, not with the course of events on some possible but non-actual world. Counterfactual speculation exceeds the limits of judicial competence.

Nonetheless, a remedy does exist from which the plaintiffs might gain relief. This court may set aside a settlement if it involves fraud. "It is well settled that a valid settlement agreement may be set aside on one of two grounds, either fraud or mutual mistake," *Estate of Jones v. C.I.R.*, 795 F.2d 566, 573 (6th Cir.1986), and that "[a] district court must reject a settlement agreement no matter how acceptable it may otherwise be, if it is not free from fraud." *Maher v. Zapata Corp.*, 714 F.2d 436, 457 (5th Cir.1983).

Even so, not just anyone can contest the validity of a settlement agreement. "Only parties to the settlement may sue to avoid it; strangers to the agreement have no standing in court to impeach its validity." 15A C.J.S. Compromise & Settlement § 30. Accordingly, the question arises whether plaintiffs were parties to the settlement. If they were, this court may set aside the settlement; if they were not, no relief is available to plaintiffs.

An individual may be a party to an agreement either through his direct consent to the terms of that agreement or through the consent of his agent acting within his power to bind the principal. Clearly, the seamen did not directly participate in the creation of the agreement. They neither negotiated it, nor signed it. Nonetheless, this does not settle the matter.

The question still remains whether, through the relations of agency, the seamen were parties to the settlement. Indubitably, an attorney is an agent of his clients. Thus, Mr. Flannery is the agent of the seamen as principals. Moreover, the position of attorney is the paradigm of those positions "which, in view of business customs, ordinarily include[] authority to appoint another agent for the principal." Restatement, Second, Agency § 79. Accordingly, the authority of Mr. Flannery to appoint an agent for the seamen may be inferred from his position as the seamen's attorney.

"An agency relation exists only if there has been a manifestation by the principal to

the agent that the agent may act on his account, and consent by the agent so to act." Id. at § 15. Although manifestation and consent are necessary to the creation of an agency relation, it is not necessary that the manifestation by the principal or the consent by the agent be expressed in written or spoken words. Id. at § 26. "It is not essential to the existence of authority that there be a contract between the principal or agent or that the agent promise or otherwise undertake to act as agent." Id., comment a. Accordingly, the absence of an express agreement does not dispose of the question of whether an agency relation exists; the acts of the individuals involved must be scrutinized as well.

■ The acts of particular interest in this connection are those which occurred when Mr. Trotter visited the office of Mr. Flannery on July 5, 1985. During this visit, as already recounted, Mr. Trotter represented to Mr. Flannery that he was pursuing a settlement in which all the damages of the corporation would be covered. At this time Mr. Trotter knew that the corporation had been found liable to the seamen and that some of the damages of the corporation would involve compensation to these seamen. Accordingly, it was wholly reasonable for Mr. Flannery to infer from Mr. Trotter's statements that he was acting to protect the interests of the seamen and that even though unauthorized to act as an agent for the seamen in these negotiations, that he consented to do so. Indeed, one can not imagine any other inference that could have been drawn from these statements.

Moreover, Mr. Flannery's failure to object at this point demonstrated the requisite manifestation by the principal.

The manifestation of the principal may consist of his failure to object to unauthorized conduct. See § 43. This is so if, in view of the relations between the principal and agent and all other circumstances, a reasonable person in the position of the principal knowing of unauthorized acts and not consenting to their continuance would do something to indicate his dissent.

Id., comment d.

Mr. Flannery's subsequent actions further reenforce this interpretation of his silence as a manifestation of approval. Relying on Mr. Trotter's representations, Mr. Flannery did not intervene in the state court action. Also, when Mr. Flannery received the magistrate's assessment of damages to the seamen, he mailed a copy of this report to Mr. Trotter—following up this mailing with a phone call to ensure that Mr. Trotter had received it. Clearly, Mr. Flannery believed that it was important for a person acting on behalf of the seamen to have this information.

From a consideration of these facts, this court must conclude that Mr. Flannery was an agent of the seamen; that Mr. Flannery's authority as agent included the authority to appoint another agent for the seamen; that Mr. Trotter, through his representations to Mr. Flannery, consented to act as an agent for the seamen in the settlement process; and that Mr. Flannery manifested his approval of this arrangement through his silence and subsequent behavior. Accordingly, this court holds as a matter of law that Mr. Trotter was an agent for the seamen in the settlement process and therefore that the seamen, through their agent, were parties to the settlement. As parties to the settlement, the seamen have standing to contest its validity.

The seamen have requested relief from a settlement that involves fraud. Having found fraud to exist, a finding only strengthened by the recognition of a fiduciary relation between Mr. Trotter and the seamen, this court holds that the plaintiffs are entitled to relief and that the relief appropriate to this case is to set the settlement aside.

### Order

This court orders that the settlement is NULL and VOID and that the bond posted pursuant to the order of this court upon the recommendation of the First Circuit remain in effect until either a new settle-

ment is executed by all of the principals or a final judgment is rendered as to the rights of all parties to this money.

So Ordered.