Paul NASH

v.

**TRUSTEES OF BOSTON UNIVERSITY.**

Civ. A. No. 88–0390 P.

United States District Court,
D. Rhode Island.

June 21, 1990.

Steven E. Snow of Partridge, Snow & Hahn, Providence, R.I., for plaintiff.

Dennis C. Hart, Office of Gen. Counsel, Boston University, Boston, Mass., and Barry J. Kusinitz, Temkin & Miller, Providence, R.I., for defendant.

## OPINION AND ORDER

PETTINE, Senior District Judge.

The plaintiff, Paul Nash ("Nash"), who was a tenured professor at Boston University ("BU"), claims that an early retirement agreement, which he signed on September 10, 1984, was wrongfully rescinded by the defendant. The complaint is in three counts; Count I alleges breach of contract; Count II is premised on a violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), contending that the retirement agreement was a benefit subject to ERISA; and Count III seeks specific performance of that part of the agreement which granted Professor Emeritus status to the plaintiff. The defendant in turn accuses the plaintiff of fraudulently inducing Boston University to enter into the agreement and further that Nash repudiated his employment contract with the University and thus gave up his tenure and caused the contract to be unenforceable for lack of consideration.

Jurisdiction, which is based on diversity of citizenship and amount in controversy pursuant to 28 U.S.C. § 1332 and 29 U.S.C. §§ 1001 *et seq.*, 29 U.S.C. § 1132(e), is unquestioned.

### *Factual Findings*

The plaintiff, presently serving as consultant to the President of Rhode Island School of Design, was a tenured professor and full-time faculty member of Boston University, where his teaching career spanned the years from 1962 until August 31, 1984. His pedagogical specialty dealt

with the theoretical foundations of classroom teaching; it encompassed the history, philosophy and psychology of education. In 1974 he became chairman of the department, which was then termed Humanistic Education and Human Services ("HEHS"). The American Association of Colleges of Teacher Education ("AACTE") recognized this pedantic field as an exemplary study. After the program had continued for approximately thirteen years, John Silber, president of the University, started doubting the value of the course and questioned the intellectual and educational ability of some of its faculty—although he did exempt Professor Nash from this assessment. Jon Westling, the Provost, shared President Silber's views; he felt that the endeavor made no material contribution to the academic mission of the University and that the plaintiff, as chairman, was responsible for its failure.

In March of 1983 the University administrators, including the Provost, Jon Westling, and Joseph Meng, Vice President for External Programs, in consultation with Paul Warren, Dean of the School of Education, presented a recommendation for the discontinuation of HEHS. In response, the University's Faculty Council elected an Ad Hoc Faculty Committee on Discontinuation; following an exhaustive inquiry, a sixty page report was issued that concluded the HEHS program should be continued. This recommendation was supported by the American Association of University Professors. Jon Westling, in September of 1983, then appointed an Ad Hoc Committee of individuals outside the university to make a similar study—this study came to an opposite conclusion. The end result was that in April of 1984, President Silber and the University Provost dealt a death blow to the program by endorsing the discontinuation recommendations of the Dean of Education and the second study; the President's recommendation was submitted in turn to the University Trustees. On July 10, 1984 the trustees voted to declare Humanistic Education and Human Services discontinued effective August 31, 1985. Though the Sword of Damocles fell in August of 1985, the inevitability of the pending blow was known to the faculty in March of 1983.

By a letter dated August 1, 1984, President Silber notified Professor Nash that the HEHS program would be discontinued on August 31, 1985. And "[a]s provided in the collective bargaining agreement, the University [would] make every effort to reassign [him] to another suitable position within the University at the same rank and salary. Should such a position not be available, however, [his] current position [would] be discontinued and [his] employment at Boston University [would] end on August 31, 1985."

The defendant contends, and I so find, that this letter was mailed pursuant to the terms of the University's collective bargaining agreement; this contract provided:

Article X, B.3. Before any full-time faculty members are terminated or transferred as a result of the discontinuation decreed by the Trustees, every effort shall be made to reassign each faculty member affected to another suitable position within the University at the same rank and salary.

\*     \*     \*     \*     \*     \*

Article X, B.5. If a faculty member is terminated in connection with a discontinuation, he/she will receive salary or notice in accordance with the provisions of Section C Paragraph 6 of this article.

\*     \*     \*     \*     \*     \*

Article X, C.6. Faculty members *whose appointments are terminated* under this Section shall be given at least one year's notice of their separation from the institution (or one year's salary and benefits). This year of notice shall begin following the President's final decision in the case after considering the recommendation of the Budget Committee. (emphasis added).

\*     \*     \*     \*     \*     \*

Article X, C.8. The procedural provisions of this Section shall be subject to grievance and arbitration under Article XXVI.

As early as 1983, the academic community of the University was cognizant of the

attitude of the school's hierarchy toward HEHS and the probability that the department would be eliminated from the curriculum of offered studies. Undoubtedly with this knowledge, six months prior to receiving the August 1, 1984 letter, Nash communicated with Rhode Island School of Design. He met with the search committee at RISD in April or May 1984; dined with Dr. Thomas Schutte, President of RISD, on June 28; had all day interviews on June 29; and again dined with President Schutte on July 23. In addition, Nash received job inquires from other colleges and universities. The record confirms that all the jobs were senior administrative positions; this latter fact, the defendant argues, indicates that Nash was planning to give up teaching.

As will be developed, the parties agreed to the details and terms of an early retirement agreement on August 27, 1984, the document was signed on September 10, 1984. Nash accepted an appointment with RISD on August 30, 1984. He then wrote, as he termed it, "bread and butter" thank you letters.

These events encompass a maize of facts, pregnant with categorical assertions and denials; all center around a series of conferences initiated by Nash with school officials. Nash attempts to prove that he did not wish to leave BU and that this was well known to the defendant; that he tried in vain to get a commitment that he would be retained as a faculty member after August 31, 1985; that he accepted the RISD appointment only after it was obvious to him he would not be able to remain at BU; that he was never told of any policy or rule which prohibited employment after an early retirement agreement was granted by the school; that only after it was clear he would not be a faculty member of BU after August 31, 1985 did he negotiate an early retirement agreement; and that he finalized and accepted the RISD appointment after his job at BU was terminated.

The defendant, on the other hand, contends Nash cunningly negotiated his early retirement agreement and fraudulently secured the same, i.e., he concealed the fact that he had a job with RISD and did in fact create a belief he had no such position.

The answers to the present controversy must be found in the substance of the many conferences Nash had with various officials of Boston University and the exhibits. This will be a difficult, if not an impossible task; credibility is the key. Unfortunately and incredibly, the "fair countenance of truth" has been sadly tarnished by one side or the other. Unlike Diogenes, I hope the light of this lantern does fall on the honest man.

Much, much emphasis has been placed on whether or not Nash was told by the controlling officials at BU that he would remain on the faculty after August 31, 1984. The testimony is, of course, relevant on the issue of credibility. The real issue is whether or not Professor Nash, knowing he had employment at Boston University, negotiated his early retirement agreement with full knowledge that he had secured a position with the Rhode Island School of Design and misrepresented that fact to Boston University so as to create a belief he had no such job.

To unfurl this wrangle I start with the series of meetings Nash had following the August 1, 1984 letter, the first of which was on August 8 with President Silber of BU. This encounter was a prologue to the testimonial dissonance of all the meetings that took place between the parties. The events of this conference as relayed by Nash evidence that he was reluctant to work elsewhere; he told Silber he had an offer of a job at the Rhode Island School of Design and that if he was not going to be retained by Boston University after August 31, 1985, he perhaps should accept it because time was of the essence. Nash testified that he went on and explained that he was being urged by the Rhode Island School of Design to make a decision. However, he did not tell Silber he was going to accept or that he would advise Silber if and when he made up his mind. According to Nash, the only comfort he received was an assurance by Silber that he, Silber, would assign to the Provost the responsibility of

giving him an answer within two weeks to his queries about his future at BU.

President Silber, in no uncertain terms, vigorously denied that Nash told him about the offer from RISD; indeed, he accused Nash of hiding it from him. As President Silber stated, he felt he had been "snookered" by Nash. As I will develop, I quite agree.

The day before his August 8 meeting with Silber, Nash had sought a conference with Westling; he left a message in Westling's office that he, Nash, had been offered a position as Vice President for Academic Affairs at RISD. This was evidenced by an exhibit which is a phone memo directed to Westling dated "8/07/ 9:55".* This message was written by someone in Westling's office as coming from Nash; it reads, he "would like an appointment to talk to you about his position at B.U. He's been offered a position as V.P. for acad. affairs at R.I." Nash and Westling then met on the 13th.

In preparation for meeting with Westling, the plaintiff prepared a document in order to show, as stated by Nash, that "[he] was seeking, despite the termination of the program in Humanistic Education and Human Services, to continue to teach at Boston University as a tenured professor and that in order to do that [he prepared] a brief history of [his] work at Boston University over the last, previous 22 years, and the different schools and departments that [he] taught in and that [he] was competent and willing to teach in so that he [Westling] *might be moved to respond to* President Silber's request to find [him] work to enable [him] to continue to teach at Boston University." This document stated, *inter alia:*

> In the past year, I have been nominated for the Presidency of Clark University; for the Presidency of Teachers College of Columbia University; for the Deanship of Cambridge College; and for the position of Vice President for Academic Affairs at Rhode Island School of Design (*and have been offered this position*).
>
> *  *  *  *  *  *
>
> I have also taught in the discontinued Human Services program, but that has always been a minor part of my Boston University responsibilities. Many people have taught in the program, as I have—Kevin Ryan, Ralph Mosher, Louis Aikman, Victor Kestenbaum, Gerald Fain—who are not being considered for termination because of their service to it.
>
> I have served Boston University in a number of capacities for 22 years. *It is my wish to continue to serve the University for another five years.* I believe that the above statement demonstrates that there are many ways in which I can do so.

Plaintiff's Exhibit 12, pp. 2–3 (emphasis added).

Nash repeated to Westling his desire to stay at Boston University and his need to make a decision about the RISD offer or risk losing the opportunity.

Westling contends that he made it clear to Nash that his continued tenured appointment at the University after the closure of the HEHS program was secure. On the other hand, Nash testified as follows:

Q. During this meeting on August 13th, did the Provost make you an offer of continued employment at Boston University?

A. Not only did he not make me an offer of continued employment on that occasion, he never made me an offer of continued employment on any occasion nor did anyone in a position of authority at Boston University.

Nash also stated that early retirement did come up at this time, but it was never discussed in detail. "[T]here was never any mention as to what effect an acceptance of an offer from one of these schools would have on early retirement; it just was no part of the discussion in any way." Tr. Feb. 13, 1990, pp. 13–14.

---

* In a telephone conference with counsel on June 20, 1990, I advised them that I needed clarification of the date typed on this exhibit, i.e., whether it was 8/17 or 8/07. It was agreed the date was 8/07.

On August 14 Nash met with Meng. The only significance was that early retirement was mentioned and the process was explained; Nash was told it was an option he might consider.

Following the August 14 meeting with Meng, Nash prepared an early retirement proposal; he did this at the suggestion of Judith Gustafson, Executive Director of the Boston University Chapter of the American Association of University Professors. Nash was advised to meet with her because of her expertise with early retirement agreements.

On August 27 Nash met with Westling and Meng; he presented his early retirement proposal. Westling said that Nash's proposal was "too rich" and that he would have to make a counter proposal—no assurance was given Nash that he could stay at Boston University. "I received nothing from him of a guarantee nature, nothing in writing...." Tr. Feb. 13, 1990, p. 31. "I felt that I needed a guarantee that I would be able to stay beyond August 25 before it would be safe for me to give up my other options.... It was never suggested that the University was in any way interested in anything I did after I left the University." Tr. Feb. 13, 1990, p. 32. Though it may be said Nash made known his other options, he certainly was not being candid as to his intentions concerning his other options. It is unrealistic to conclude that on August 27 he was still in doubt about the RISD offer, which was, as will be shown, formally accepted only three days later. The mechanical formality of written acceptance was delayed by him pending the guarantee of a finalized agreement of the terms of his early retirement. He had orally accepted the appointment by August 27.

The testimony about this August 27 meeting makes for a classic study of contradictory versions by different people witnessing the same event. Nash maintained he told the parties of his RISD offer, whereas Meng denied this and insisted he never would have negotiated an early retirement agreement if he knew Nash had a job, because Nash could have resigned his position at Boston University and taken the

RISD offer—which would have ended the matter. I accept Meng's version. Westling was categorical in his assertion that he told Nash he could remain at Boston University, which statement Nash also denies as ever having been made.

Meng backs up his testimony with two contemporaneous documents (exhibits 17 and 19)—one concerning his August 27 meeting with Nash at which Westling was present (exhibit 17) and the other detailing his meeting with Nash alone four days later on August 31. I quote from defendant's brief at pages 16–17 which I find to be an accurate reflection of the testimony; I agree with and adopt the defendant's arguments.

Meng testified that before Nash arrived for the August 27 meeting, Meng and Westling met to discuss Nash. Meng informed Westling that it was important that they discuss two matters in particular with respect to Nash. (*March 13*, p. 122, lns. 17–21.)

The first was

to inform [Nash] in no uncertain terms that his position was not being discontinued and the reason for that was because I didn't want—if we were going to talk about early retirement—the other faculty members to think they had some entitlement to it since we believed that they would be discontinued without additional payments....

(*March 13*, p. 122, ln. 17—p. 123, ln. 3.)

Second, because Meng had heard of Nash's interest in RISD, Meng testified that "it was important that we ask Professor Nash where that stood because if he was still a candidate, then we should postpone negotiations for an early retirement to see what would actually in the end transpire." (*March 13*, p. 123, lns. 6–9.)

Meng testified that he remembered specifically that Nash was told by either Meng or Westling that

... [Nash's] position was going to be maintained. That he didn't have to worry about it; he immediately protested that he had already decided that he wanted to in effect bring about a

change in his life; that he wanted to retire from Boston University, do consulting and writing and he was now just absolutely interested in an early retirement deal.

THE COURT: In other words, he, in essence, just rejected any opportunity to stay at BU?

THE WITNESS: Absolutely.

(*March 13*, p. 123, ln. 121—p. 124, ln. 6.) Meng's contemporaneous memorandum, Exhibit 17, confirms his testimony and that of Westling. The memorandum is to the early retirement file and focuses on the early retirement negotiations but is clearly premised on Nash's knowledge that he was to be retained and states that, after Nash described his early retirement proposal for over $206,000 in payments,

> Westling remarked that he felt Nash would be of greater value to the University by remaining in active status. I added that his proposal was on the high side, principally because he was not a faculty member that the University could in any way consider surplus and therefore, the incentive to encourage an early retirement agreement was lacking.

(Ex. 17).

Meng met with Nash again four days later, on August 31. At that meeting, Meng again told Nash he would be retained after the HEHS closure. Meng's memo to the file, dictated on the same day as the meeting (*March 13*, p. 133, lns. 6–14) makes it clear:

> I met with Nash for about an hour on August 31, 1984. I explained to Nash that his situation was such that his job was secure after the termination of the HEHS program so he need not feel pressured into seeking early retirement.

This testimony evoked the following comment from the Court:

> You know, we are dealing with highly educated, highly intellectual individuals. We are not talking about even average people. There is something wrong here someplace. Someone is fabricating a complete, total and absolute story—and who is the fabricator? I don't want to be so bold as to use the word "lie."

At any rate, an early retirement agreement was negotiated. Nash then wrote what he termed "bread and butter" thank you letters to Meng, Silber and Westling.

From all of this testimony, I find:

1. The HEHS program was, of course, terminated.

2. President Silber's letter to Nash advising him of this termination did not assure Nash that he would be retained at Boston University.

3. Nash became very concerned about his future at Boston University, where he preferred to stay.

4. The concern and uncertainty about his future triggered a series of conferences by Nash with various Boston University officials, especially with Silber, Westling and Meng. These conferences covered the period from on or about August 1, 1984 to August 31, 1984.

5. During the August 1, 1984—August 31, 1984 period, Nash received various job offers and did actively explore and negotiate a position with RISD; six months prior to August 1, he was exploring possible options at RISD.

6. Boston University was aware of Nash's dealings and prospects with RISD but was never advised of the details of his active negotiations with RISD and, as of August 27, of his virtual acceptance of the RISD offer, which was formally recorded on August 30.

7. At the August 27 meeting, Meng did indicate to Nash he would be retained. Westling did tell Nash that his position as a Boston University faculty member was secure.

8. Nash negotiated his early retirement agreement with full knowledge and confidence that he did in fact have a secured offer of employment from RISD.

9. Nash formally accepted the RISD offer after completing all negotiations for early retirement but before the agreement was actually signed.

10. Meng would never have negotiated an early retirement agreement if he knew Nash had secured for himself a job at RISD.

*Legal Conclusions*

In this discussion, I again will reiterate and discuss facts. Pleonasm is unattractive, but in this ambience, where someone is obviously distorting the truth, I justify it as necessary to italicize the court's conclusions.

The resolution of this case depends on the defense, urged by Boston University, that Nash fraudulently induced Boston University to enter into the early retirement agreement. The fraud claim has no vitality absent a false representation by Nash, made negligently or with the intent to mislead Boston University; the intention that Boston University would act upon such representation; and the result that Boston University reasonably relied upon the representation and was thus induced to execute the early retirement agreement. This claim is the sum and substance, heart and soul of this entire case. It is the cornerstone to a successful defense and the one on which Boston University must stand or fall.

■ The defendant argues that, "Nash's misrepresentations about the RISD job were fraudulent, but even if they were merely negligent, they would support recision of the early retirement agreement." Restate (Second) of Contracts § 159 (1981); *Farland v. T & T Fishing Corp.*, 682 F.Supp. 700, 701 (D.R.I.1988); *Holmes v. Bateson*, 434 F.Supp. 1365, 1367 (D.R.I.1977); *V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411, 414–15 (1st Cir.1985) (all said citations taken from defendant's brief). There can be no dispute that this legal procedure is, indeed, the governing law in this case. The record discloses a strong factual predicate for its application. The defendant admits in its brief that Boston University was aware of Nash's dealings with RISD but claims that Nash understood that only if he turned the RISD job down would he be able to pursue "the BU" alternatives of early retirement or

further teaching. I find no convincing direct evidence, but I do find sufficient circumstantial evidence to support this conclusion.

As the defendant argues in its brief, Meng testified:

I recall very specifically the question being asked, "What about the job at the Rhode Island School of Design?" And I recall Professor Nash saying "That's out of the question; I kept them waiting too long; they are talking to another candidate."

Westling likewise testified that Nash had said that the Rhode Island School of Design insisted upon having an answer from him before he was in fact ready to give an answer and that he had, therefore, passed that opportunity by and that RISD had gone on to consider other candidates. In addition to this testimony, a memo prepared by Meng was introduced as evidence. This memo recorded the substance of the August 27th conference; it reads, "[i]n response to the question about the Rhode Island School of Design, Nash responded that he had already informed them that he was not available for the position and is currently negotiating with someone else" (i.e., RISD was negotiating with someone else).

Now Nash denies all of this. When questioned if he told Meng or Westling about the Rhode Island School of Design on August 27, 1984, he replied:

Nothing, there was no discussion on August 27 of Rhode Island School of Design, none at all. There was never a discussion that another candidate had been employed in that post because I would never have known such a thing, never said such a thing.

If it all stopped here, the Court would have been confronted with a difficult credibility choice. However, subsequent developments dramatically weighted the scales in favor of the defendant; these developments were:

1. A letter of August 27 from Professor Nash to Dr. Paul Warren, Dean, School of

Education; the third paragraph of this letter reads:

I have been offered positions at two other institutions, but I have kept them waiting beyond the limit of their needs, so they are now negotiating with other candidates. However, the process of considering them, and the Boston University negotiations, have made me ready for a more radical change in my life. I am ready to try to make it on my own, with some writing and perhaps consulting to sustain me.

2. A telephone conversation Nash had with Meng in early September. The defendant's brief accurately and succinctly articulates this event—I researched and checked its arguments—I adopt its description:

Nash continued to misrepresent the facts in a telephone conversation with Meng in early September. On direct examination Nash admitted that after he had signed the early retirement agreement [on September 6], but prior to its approval by the Executive Committee of the University's Trustees [September 11, see Ex. 25], he had a telephone conversation with Meng in which the subject of RISD obviously came up. (*Feb. 13*, p. 65, ln. 14—p. 66, ln. 18). Meng asserted that Nash had represented to him in this conversation that Nash "had agreed to assist on a part-time consulting basis in the Office of the Vice President for Academic Affairs at RISD until the individual who had been recruited for that position assumed the job on a full-time basis, presumably in January 1985." (See Ex. 33, par. 2) Nash denied that he said anything about the other candidate starting the job in January of 1985, but admitted that "[t]here was a telephone conversation. *I did tell him at that time that my appointment at RISD was two days a week rather than full-time. That much is true.*" (See *Feb. 13*, p. 66, lns. 2–15.)

Nash is admitting to a material misrepresentation in this conversation with Meng. In light of his contract with RISD, agreed to on August 24, and signed and delivered in hand to RISD by

August 30, there was absolutely no reason for him to tell Meng, when the subject of RISD came up, that "my appointment at RISD was two days a week rather than full-time." Nash's contract stipulated that Nash would be the Vice President for Academic Affairs at a salary of $55,000. It was a full-time position. Clearly, the RISD job was important to Meng or it would not have been discussed in this telephone conversation. This is another example of the untruthfulness of Nash's claim that he never discussed RISD with Meng.

3. A series of letters Nash wrote which he termed "bread and butter" letters. The Court found the "butter" on these letters rather rancid and sour. Again, the Court adopts the description in the defendant's brief:

Although Meng recorded in only one document Nash's false representation that he had kept RISD waiting too long, that he did not take the job and that RISD had moved on to other candidates, Nash authored five documents which convey the same misleading message.

The first is his August 27 letter to Warren (Ex. S.)

Next, in Nash's September 10 letter to Meng (Ex. T; copy introduced as Ex. 22) written during Nash's second week on the job at RISD, Nash wrote:

I have been kept busy outside the University with some postponed writing as well as some consulting—including Rhode Island School of Design (who would like more of my services)....

On the same day Nash wrote to Silber (Ex. 23; no original is available but see typed version of letter attached to the Exhibit) and stated:

I have been able to get to some postponed writing and to do some consulting—at Rhode Island School of Design (who decided they needed to negotiate with another candidate because of my delay)....

In a September 13 letter to Westling (original marked as Ex. U, copy also marked as Ex. 27) Nash wrote:

I am doing some postponed writing and some consulting with other institutions—Rhode Island School of Design, Southeastern Mass University, and the state colleges and universities of Massachusetts. Rhode Island School of Design decided to go back to their second choice candidate when I asked for more time to negotiate with Boston University. Subsequently, it turned out that he could not start before January 1985 or later. They asked me to serve in a consulting capacity this fall and I agreed to do so—in an acting part-time capacity.

Nash wrote a second time to Silber (Ex. 32) on September 19, 1984, his third week on the job as the Vice President for Academic Affairs at RISD:

Things did not work out at Rhode Island School of Design quite as I expected, because of their need for an earlier decision than I could give them. However, I am consulting with them on a part-time basis, as well as with Southeastern Massachusetts University and the State universities and colleges of Massachusetts.

On direct examination, Nash contended that, when he wrote to Silber that the Rhode Island School of Design decided it needed to negotiate with another candidate because of his delay, he was writing a "bread and butter" letter, in order to take a "jab" at the University. (*Feb. 13*, p. 48, ln. 4—p. 49, ln. 3.) Nash testified that

in a bread and butter letter what you do is you thank the hostess or host for the tea but if the cake was stale, you might add a little jab to tell them that the cake was stale and Mr. Silber's cake was stale and Mr. Westling's cake was stale....

(*Feb. 13*, p. 48, lns. 11–15.)

At trial, I intervened and made known the impact of the unquestioned contradictions in these documents. Nash's explanation left me cold; his explanatory testimony simply was not credible:

I was trying, as I said earlier to tell him [Silber] that the cake that I re-

ceived was stale and it was so stale that I almost broke my jaw on it and that—that the President and Jon Westling had sent me very ill through delaying to give me the answers that I needed about my ability to continue as a tenured faculty member at Boston University, which is what I wanted to do, so I wanted to give him a little dig. It was a little dig at the President.... And they had indeed in August negotiated with other candidates because of my delay. That's the way—that's the way searches are conducted.

(*Feb. 14*, p. 83, ln. 15—p. 84, ln. 9.)

I feel I must conclude from all this evidence that Nash, indeed, intended and did mislead Boston University about the RISD job—his own testimony destroyed his own credibility.

Countering the defendant's position, the plaintiff argues that the evidence clearly shows Nash wanted to remain at BU. I do not quarrel with this position, but it does not overcome or justify the misleading representations he made. Of course, he was concerned about his future and it was only natural for him to explore his options, but such conduct, albeit known to BU, was no license to commit fraud. He tries to justify the "bread and butter" letters by arguing that they were written well after the negotiations relating to the early retirement agreement were complete and thus are immaterial. I do not agree; these letters evidence Nash's continuing conduct and are outright falsehoods and contradict the position he urges me to accept.

The plaintiff further argues that the status of Nash's negotiations with RISD were not material to BU's decision to enter into an early retirement agreement; that post-retirement employment is of little or no concern when the University enters into an early retirement agreement. Not so. I accept Dr. Silber's testimony—it is infinitely logical. It is inconceivable to me that the University would permit a professor to first secure a position at a comparable salary and then execute an early retirement agreement. As Dr. Silber states in answer to inquiries by the Court:

THE COURT: May I interrupt?

MR. SNOW: Yes, your Honor.

THE COURT: Doctor, once a retirement agreement has been executed, it is the attitude of the University that the faculty member would be barred from seeking a placement elsewhere if he wanted the retirement agreement to remain in force and effect?

THE WITNESS: No, not at all, not if his seeking this alternative employment was prospective. We try to reach our understanding with the faculty on the basis of their situation, try to meet their needs as they inform us of them, at the time that an early retirement agreement is made. But under no circumstances would we offer an early retirement agreement [to a] person who had, prior to negotiating that agreement, already accepted a job at another institution.

Now if he—if he resigned from the University and took early retirement and then a month or two later, looked and found a job, if it—if it came up and was much to the surprise, no it wouldn't affect it at all but I did not know of any cases in which we have offered a person early retirement when already in advance he has accepted a position full-time with compensation.

■ Finally, the plaintiff argues that Meng admitted that Nash did not violate the early retirement agreement. It may be that there was no *per se* violation of the written terms of the agreement; but that is not the point. In a fraud, the ultimate, perhaps pristine, document the parties execute is not the focus of attention. The trickery employed to reach that end is the infectious conduct that destroys the contract and becomes the object of inquiry.

A false representation having been made, the questions remain:

a) Were these representations material?

b) Did Boston University rely upon them?

c) Did these representations induce Boston University to execute the early retirement agreement?

I find each of these questions must be answered "yes" because I accept as true and logical the following, as reported in defendant's post-trial brief:

Meng's testimony:

The early retirement agreements are incentives to get people to retire. If I knew he had this job, whether he was going to get it in the near future, I would have no incentive to get him to resign.

Q. What if he told he had already taken the job?

A. I would have said goodbye.

(*March 13*, p. 130, lns. 8–13.)

I certainly would not have recommended to the University that he [Nash] be given any kind of payment had I known that he was still a candidate and what I now know, long after the fact, he was not only a candidate but he had already accepted the job.

(*March 13*, p. 143, lns. 10–14.)

Westling's testimony was the same:

Q. Did Nash's statement about the Rhode Island School of Design at the August 27 meeting have any affect on your consideration as to whether he should be granted that early retirement agreement?

A. Yes.

Q. What affect was that?

A. Well, had he indicated that he was going to take a full time senior administrative position at another institution, there would have been no point in providing an early retirement agreement and I wouldn't have approved it.

(*March 14*, p. 56, lns. 1–11.)

Silber also testified as to the materiality of the RISD job to the early retirement negotiations. (*March 13*, p. 60, ln. 4—p. 61, ln. 6). The Court referred to Silber's testimony in responding to one of plaintiff's counsel's efforts, on the last day of trial, to distract from the issues:

... as I keep hearing all of this testimony which is going off in so many directions, I keep asking myself are we getting away from what appears to me at least superficially to be the whole crux of the case, and that is, whether

or not Professor Nash secured a job at Rhode Island School of Design before negotiating a retirement agreement with Boston University?

And if that is yes, then we have to take into consideration what—what— what justification did he have for doing that? and did he do so fraudulently, did he do so intentionally? Did he do so taking advantage of a retirement system that had a different purpose entirely.

... it appears to me that one thing that President Silber said yesterday, which makes a lot of good sense, and that is you don't have retirement agreements for people who are out going away—who are leaving the University because they have secured jobs at greater pay. It would make no sense. The retirement agreement has no meaning in that, in such a situation. Is that what happened here? Because he did get 13 some thousand dollars more at Rhode Island School of Design than he was getting at Boston University. Isn't that the crux of this case? (*March 14*, p. 28, lns. 11–24; p. 29, lns. 1– 11)

Plaintiff's counsel's reply is telling. He agreed with what the trial showed was inescapable: if Nash had already acquired the RISD job and misrepresented the facts to the University, that would constitute fraud and would be grounds for rescission of the early retirement agreement.

MR. SNOW: Your Honor, I absolutely agree with you on what you said and if, in fact, Paul Nash had made up his mind that I want to leave Boston University; I don't want to stay here; I want to go elsewhere, and let me see how much I can get Boston University to pay me, and if he had misrepresented that situation, that would have been fraudulent and he would have had no right to a retirement agreement. I absolutely agree with that. (*March 14*, p. 29, lns. 12–20.)

█ I conclude that the representations were material; Boston University relied

upon them and was thus induced to execute the early retirement agreement.

As can be seen from the citations cited *supra*, much has been written as to what constitutes a misrepresentation. In capsule form, such misrepresentation exists when "the assertion is not in accord with the facts"; when half truths are uttered that are misleading; if the maker "knows or believes that the matter is not as he represents it to be" or "knows or believes [it] to be materially misleading because of his failure to state additional or qualifying matter"; or when the fraud is grounded in either affirmative acts or concealment.

In *V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411 (1st Cir.1985), the First Circuit, applying Massachusetts law which is not inconsistent with Rhode Island law, stated at 414–415:

What we face here, however, are allegations of partial or incomplete statements that may by their incompleteness be actionable. Restatement of Torts (Second), §§ 529, 551(2)(b). There is much case law in Massachusetts supporting the proposition that a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party.

"Although there may be 'no duty imposed upon one party to a transaction to speak for the information of the other ... if he does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all the material facts bearing upon the point that lie within his knowledge. Fragmentary information may be as misleading ... as active misrepresentation, and half-truths may be as actionable as whole lies....' See Harper & James, Torts, § 7.14. See also Restatement: Torts, § 529; Williston, Contracts (2d ed.) §§ 1497–1499." *Kannavos v. Annino*, 356 Mass. 42, 48, 247 N.E.2d 708 (1969). *See also Maxwell v. Ratcliffe*, 356 Mass. 560, 562–63, 254 N.E.2d 250 (1969) ("Because the question of dryness of the cellar had been raised expressly, there was

special obligation on the brokers to avoid half truths and to make disclosure at least of any facts known to them or with respect to which they had been put on notice."); *Nei v. Boston Survey Consultants, Inc.*, 388 Mass. 320, 322, 446 N.E.2d 681 (1983) ("[T]here is no suggestion that the defendants made a partial disclosure or stated a half truth which may be tantamount, under certain conditions, to a falsehood if there is no further expatiation."); *Nei v. Burley*, 358 Mass. 307, 446 N.E.2d 674 (1983); *Catalina Yachts v. Old Colony Bank & Trust Co.*, 497 F.Supp. 1227 (D.Mass.1980).

This duty to avoid misrepresentations is so strong that the deceived party is not charged with failing to discover the truth. *Snyder v. Sperry & Hutchinson Co.*, 368 Mass. 433, 446, 333 N.E.2d 421 (1975) ("[I]f the seller's representations are such as to induce the buyer not to undertake an independent examination of the pertinent facts, lulling him into placing confidence in the seller's assurances, his failure to ascertain the truth through investigation does not preclude recovery.").

I find for the defendant on the issue of fraud as discussed herein; this ruling obviates the need to consider any and all other issues raised by the parties. Judgment will be entered for the defendant.

In finding as I have, I am not insensitive to the dilemma which engulfed Professor Nash when HEHS was discontinued; the loss of his department and the teaching of his discipline, which he had developed over many long years of scholarly study and research, was a traumatic assault. He cannot be faulted for seeking to secure his future, especially in the factual setting revealed here. On the other hand, no outsider can question Dr. Silber's conclusion that HEHS was not contributing to the academic dimensions of Boston University; he had every right to advocate that the course be abolished and when it was, the August 1 letter to Professor Nash was entirely appropriate. However, if the University did, indeed, intend to retain Professor Nash, at a minimum, Dr. Silber, Meng or Westling might have put it in writing and given such

document to Nash. In spite of this, the cold mandate of the law forecloses any consideration of such failure—the fact remains, when Nash received the letter of August 1, he still was under contract to Boston University for a remaining term of one year. It was illegal for him to engage in deception to enrich his own position at the expense of the university.